STATE OF MINNESOTA

IN SUPREME COURT

A13-1605

Anoka County                                                    Anderson, J.

State of Minnesota,

          Respondent,

vs.                                                    Filed:  January 28, 2015
                                                     Office of Appellate Courts

Patrick William Benton,

          Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Anthony C. Palumbo, Anoka County Attorney, Marcy S. Crain, Assistant Anoka County Attorney, Anoka, Minnesota, for respondent.

Jessica Merz Godes, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.     A criminal defendant is not entitled to relief based on an alleged violation of his Sixth Amendment right to a public trial when the defendant requested the courtroom closure and the alleged error does not seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

1

2. The allegedly erroneous admission of relationship evidence under Minn. Stat. § 634.20 (2014) was harmless because it did not significantly affect the verdict.

3. Appellant's pro se arguments lack merit.

Affirmed.

## O P I N I O N

ANDERSON, Justice.

Appellant Patrick William Benton was convicted of first-degree domestic-abuse murder, Minn. Stat. § 609.185(a)(6) (2014), and two counts of second-degree murder, Minn. Stat. § 609.19 (2014), for the 2011 death of Susan Courteau. Benton presents two questions on direct appeal: (1) whether a criminal defendant is entitled to relief based on an alleged violation of his Sixth Amendment right to a public trial when the defendant requests the courtroom closure; and (2) whether the district court erred by admitting relationship evidence under Minn. Stat. § 634.20 (2014). We affirm.

Benton and Courteau met at a detox facility in February 2011, and their relationship became intimate soon thereafter. In September 2011 Courteau told her apartment manager that Benton would be at the apartment helping with chores while she was on house arrest following a DWI probation violation. Courteau's sister felt that Benton's presence threatened Courteau's sobriety. On October 11, 2011, Courteau told her sister that Benton was keeping alcohol in her apartment, which made Courteau nervous and upset. When the sister came to the apartment to help Courteau confront Benton, she found Benton inebriated on Courteau's bed. The sister told Courteau she

2

should call the police to remove Benton from the apartment. But the next day Benton still refused to leave the apartment, and Courteau did not call the police.

On October 13, 2011, the day Courteau died, the apartment manager saw Benton with a dog. She called Courteau to tell her that the apartment complex did not allow dogs. Courteau told the manager that the dog belonged to Benton and that she was afraid of Benton and wanted him to leave. After the manager asked Benton to leave and he refused, the manager called the police. That same morning, the police removed Benton from the apartment and drove him to his sister's home. Benton and his sister spent the day together and got "pretty drunk." Later that day, Benton and Courteau spoke on the phone, and Benton became angry when Courteau told him the relationship was over and she had put all of his belongings in her garage. Benton went to Courteau's apartment. He collected his belongings and was seen around Courteau's apartment complex as late as 6:00 p.m. on the night of the murder.

When Courteau's sister had not heard from Courteau later that day, she went to the apartment. The door was locked, but through the door crack she saw Courteau's legs and feet lying on the ground. She got the manager to open the door and found Courteau lying on her back with blood on her face and arms. She had been stabbed six times in her back and chest and three times in her arms.

Benton was arrested early the next morning. He initially told the police that he had not hurt or killed Courteau, and that on the night of Courteau's death he had spoken to her only briefly at her apartment. The next day he admitted to going into her apartment, but said that Courteau had stabbed herself in a suicide, and he stabbed her

3

only once "to settle her down." Benton was indicted for first-degree premeditated murder, Minn. Stat. § 609.185(a)(1), and first-degree domestic-abuse murder, Minn. Stat. § 609.185(a)(6), and was also charged with two counts of second-degree murder, Minn. Stat. § 609.19.

Benton moved to bifurcate the trial to allow separate consideration of the "past pattern" element of domestic-abuse murder. *See* Minn. Stat. § 609.185(a)(6) (requiring that the "perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member"). The district court granted the motion, stating that if the jury found Benton guilty of the other elements of domestic-abuse murder in phase one of the trial, the "past pattern" element would be tried in phase two.

Before trial, the State sought to admit "relationship evidence" under Minn. Stat. § 634.20 of Benton's past incidents of domestic abuse against his sister and his former girlfriend. The district court granted the State's motion to admit the relationship evidence in phase one of the trial. At trial, Benton's sister testified about an incident that had occurred 6 or 7 years earlier during which Benton "threw [her] around like a rag doll," kicked her, and pulled her hair for 10 minutes because she had cleaned the dishes wrong. She also testified that Benton "would get mean when he was drunk." Benton's former girlfriend stated that she and Benton had been in a relationship for 5 or 6 years. She testified that on one occasion Benton accused her of "throwing water on him" and then punched her repeatedly, giving her a black eye. She also testified that Benton physically abused her "at least once or twice a week" during their relationship, and that the abuse included punching, kicking, slapping, and hitting her on the head. She said she was

4

afraid of Benton, and on several occasions he threatened to stab her with a knife. Before the testimony of Benton's sister and Benton's former girlfriend, and again at the close of evidence, the district court provided a cautionary instruction to limit the jury's use of the relationship evidence.

Benton requested two courtroom closures during phase one of the trial, on April 30 (5 days after trial began) and May 1, 2013. The State did not object to either closure. First, on April 30, defense counsel requested a closure so Benton could address the court regarding prior testimony and his dissatisfaction with his representation. Defense counsel noted that he did not know if any press was in the courtroom, but he did not want the public—and, ultimately, the jurors—to hear information that might reveal Benton's trial strategy. The district court asked Benton whether he would prefer an open or closed courtroom, and Benton said he wanted a closed courtroom. The court then heard Benton's concerns. Eventually a recess was called so Benton could continue discussing his concerns with defense counsel. When court reconvened in the afternoon, the district court ordered the courtroom to be closed "for the same reasons that [it] identified previously." The parties continued to discuss the same issues. After Benton finished airing his concerns, the courtroom was reopened and the trial reconvened.

The following day, on May 1, 2013, defense counsel again requested a courtroom closure so the parties could discuss Benton's request to be absent from the day's proceedings, and to prevent the jury from seeing Benton in restraints and prison-issued clothing. Again the district court confirmed that Benton agreed with defense counsel's request to close the courtroom. After discussing on the record Benton's request to be

5

absent, the court called a recess so Benton could discuss the matter with his counsel. After reconvening, the court stated, "I have not yet reopened the courtroom. Pursuant to my prior order, the courtroom is remaining closed while we essentially conclude the hearing that we began last time." After further discussion on the record, Benton decided to be absent from the day's proceedings. Benton departed, and the courtroom was reopened.

On May 10, 2013, the jury acquitted Benton of the first-degree premeditated murder charge but found him guilty of two counts of second-degree murder. The jury also found that the State had proven beyond a reasonable doubt all the elements of first-degree domestic-abuse murder, with the exception of the element of "past pattern," which had been reserved for phase two of the trial. Benton waived the jury for phase two of the trial, and the district court concluded that the State had proven the "past pattern" element beyond a reasonable doubt. The district court therefore found Benton guilty of first-degree domestic-abuse murder and sentenced Benton to life imprisonment with the possibility of release. This direct appeal followed.

I.

Benton first argues that the courtroom closures on April 30 and May 1, 2013, violated his Sixth Amendment right to a public trial. Whether the Sixth Amendment right to a public trial has been violated is a constitutional issue that we review de novo. *State v. Brown*, 815 N.W.2d 609, 616 (Minn. 2012).

Both the U.S. and Minnesota Constitutions provide: "In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial . . . ." U.S. Const. amend. VI; Minn.

Const. art. I, § 6. "[T]he public trial guarantee applies to all phases of trial . . . ." *Brown*, 815 N.W.2d at 617 (citing *Presley v. Georgia*, 558 U.S. 209 (2010)); *see, e.g.*, *Press-Enter. Co. v. Superior Court* (*Press-Enter. II*), 478 U.S. 1, 10-13 (1986) (extending right to preliminary hearings); *Waller v. Georgia*, 467 U.S. 39, 46-47 (1984) (extending right to suppression hearings); *Press-Enter. Co. v. Superior Court* (*Press-Enter. I*), 464 U.S. 501, 505-10 (1984) (extending right to voir dire).

We need not decide whether the district court erred by granting the courtroom closure requests, because the alleged errors were invited by Benton and did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. As a general rule "a party cannot assert on appeal an error that he invited or that could have been prevented at the district court." *State v. Carridine*, 812 N.W.2d 130, 142 (Minn. 2012). This rule "discourage[s] litigants from intentionally creating appealable issues." *State v. Gisege*, 561 N.W.2d 152, 159 (Minn. 1997) (citing *State v. Kortness*, 284 Minn. 555, 558, 170 N.W.2d 210, 213 (1969)). We have applied the invited-error doctrine to courtroom closures in the past. For example, in *State v. Weigold*, 281 Minn. 73, 76, 160 N.W.2d 577, 579-80 (1968), we held that a party who consents to a courtroom closure cannot claim a violation of the right to a public trial.[1] We are not the only court to apply the invited-error doctrine to courtroom closures. *See State v. Cassano*, 772 N.E.2d 81, 95

---

[1] Benton claims he is entitled to an automatic reversal, arguing that the trial court's failure to make the findings required by *Waller v. Georgia*, 467 U.S. 39, 45 (1984), constitutes a structural error. But as the *Waller* Court explicitly acknowledged, when a defendant consents to the courtroom closure, he may be procedurally barred from seeking relief as a matter of state law. *Waller*, 467 U.S at 42 n.2.

(Ohio 2002) (citing *United States v. Olano* 507 U.S. 725, 736 (1993)) (affirming a conviction because the defendant requested the closure and the closure "did not affect the fairness, integrity, or public reputation of the trial").

The invited-error doctrine, however, does not require us to turn a blind eye to errors that seriously affect the fairness, integrity or public reputation of judicial proceedings. In *Gisege*, we rejected an argument that the invited-error doctrine prohibits a court from reviewing all errors, including errors that would otherwise merit relief under the doctrines of plain error or fundamental law. 561 N.W.2d at 158 n.5; *see also State v. Goodloe*, 718 N.W.2d 413, 424 (Minn. 2006). To merit relief under the plain-error doctrine, the alleged error must seriously affect the fairness, integrity or public reputation of judicial proceedings. *State v. Bahtuoh,* 840 N.W.2d 804, 811 (Minn. 2013). Stated differently, we have the discretionary authority to remedy errors that seriously affect the fairness, integrity or public reputation of judicial proceedings, even when the defendant invited the error.

Here, Benton did not just consent to the closures: he actively sought them. The record clearly reflects that Benton's counsel requested both closures, and on both occasions, Benton confirmed that he wished the courtroom to be closed. Benton requested the courtroom closures because he believed they would benefit his defense, yet now he seeks a second bite at the apple because he did not receive the result he wanted. *See State v. Tovar*, 605 N.W.2d 717, 726 (Minn. 2000) ("Trial counsel cannot have it both ways: failing to raise a specific objection at trial for its own reasons of trial strategy, then claiming the admission of such evidence as error on appeal."). Moreover, the

8

closures were limited to the discussions that merited the closures. Under these circumstances, allowing Benton to request courtroom closures at trial and then receive relief on appeal would *thwart* the fairness, integrity, and public reputation of judicial proceedings. *See United States v. Cotton*, 535 U.S. 625, 634 (2002) (noting that the "real threat . . . to the 'fairness, integrity, and public reputation of judicial proceedings' " would be to allow defendants to prevail on an unpreserved error); *cf. Clifford v. Peterson*, 276 Minn. 142, 145, 149 N.W.2d 75, 77 (1967) (finding errors to be "fundamental" only if they "cause a miscarriage of justice," or "result in substantial prejudice on an issue 'vital in the litigation' " (footnotes omitted)).

We hold that Benton is not entitled to relief on the alleged violation of his Sixth Amendment right to a public trial because the alleged errors were invited by Benton, and they did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

## II.

Next, Benton argues that the district court erred by admitting relationship evidence under Minn. Stat. § 634.20 (2014) during phase one of the trial. Benton claims that the district court should not have admitted evidence of domestic abuse against persons other than Courteau, the victim of the instant offense. In the alternative, Benton asserts that the probative value of the relationship evidence was substantially outweighed by the danger

of unfair prejudice.[2] We need not determine whether the district court erred by admitting the relationship evidence because we are satisfied that the evidence did not significantly affect the verdict. *See State v. Courtney*, 696 N.W.2d 73, 79-80 (Minn. 2005).

A conviction obtained through erroneous admission of evidence must be reversed if there is a reasonable possibility that the wrongfully admitted evidence "significantly affected the verdict." *State v. Post*, 512 N.W.2d 99, 102 n.2 (Minn. 1994). When determining whether evidence significantly affected the verdict, we consider

> whether the State presented other evidence on the issue for which the other crime evidence was offered. We have also considered whether the district court "instructed the jury to limit the use of the other crime evidence and not to convict [the defendant] based on that evidence." We presume a jury follows a court's cautionary instruction. Other relevant considerations are whether the State dwelled on the evidence in closing argument and whether the evidence of guilt was overwhelming.

*State v. Riddley*, 776 N.W.2d 419, 428 (Minn. 2009) (alteration in original) (citations omitted).

The prosecutor made sparse use of the relationship evidence in closing argument. He mentioned the relationship evidence only once in passing, stating "[Benton's sister has] seen the violence that happens when he's drunk. He threw her around like a rag doll." In contrast, Benton's counsel forcefully discredited the testimony of Benton's

---

[2] We note that both alleged errors stem from the district court's decisions to grant Benton's request to bifurcate the trial yet allow relationship evidence during both phases. Had the "past pattern" element of domestic-abuse murder been at issue in phase one of the trial, the relationship evidence would have been directly probative of that element. *State v. Cross*, 577 N.W.2d 721, 725 (Minn. 1998).

sister and former girlfriend during closing argument. He also cautioned the jury against using the relationship evidence for an improper purpose, stating that the evidence "is about reworking the past and trying to mold it into [the State's] theory of the case." The district court provided numerous cautionary instructions as well, which "lessened the probability of undue weight being given by the jury to the evidence." *State v. Kennedy*, 585 N.W.2d 385, 392 (Minn. 1998).

The State also provided overwhelming evidence of Benton's guilt. The State played Benton's recorded confession that he stabbed Courteau once in her shoulder to "settle her down." The State also offered testimony that Courteau told the apartment manager that she was afraid of Benton, Benton was angry at Courteau for breaking up with him and putting his belongings in a garage, Courteau had several deep stab wounds in her back (which was inconsistent with Benton's claim that Courteau had stabbed herself), and Benton bought similar clothing to replace his bloodstained clothes after the stabbing. This evidence controverts Benton's claim that Courteau committed suicide and provides overwhelming evidence that Benton "cause[d] the death of a human being while committing domestic abuse, . . . under circumstances manifesting an extreme indifference to human life." Minn. Stat. § 609.185(a)(6). Based on the record in this case, we conclude there is no reasonable possibility that the admission of the relationship evidence significantly affected the jury's verdict. Therefore, the allegedly erroneous admission of relationship evidence under Minn. Stat. § 634.20 was harmless.

11

III.

Finally, Benton's pro se brief contains what we construe as claims of insufficient evidence and ineffective assistance of counsel. Benton's arguments are unsupported by the record and are devoid of legal authority. *See State v. Bartylla*, 755 N.W.2d 8, 22 (Minn. 2008) ("We will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority."). We therefore conclude that these claims are meritless.

Affirmed.