*337 STRAS, Justice
(concurring).
“In all criminal prosecutions, the accused shall enjoy the right to a ... public trial.” U.S. Const, amend. VI; see also Minn. Const, art. I, § 6. This command, found in the Sixth Amendment to the United States, Constitution and Article I, Section 6 of the Minnesota Constitution, protects an accused by making criminal trials open to public view. Giving access to the public ensures that the accused is “fairly dealt with and not unjustly condemned” and keeps the “Triers keenly alive to a sense of their responsibility and to the importance of their functions.’ ” In re Oliver, 333 U.S. 257, 270 n. 25, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (quoting 1 Thomas M. Cooley, Constitutional Limitations 647 (8th ed.1927)). The trial in this high-profile case, which captured the attention of Minnesotans because of its unusual facts and the deaths of two teenagers, is precisely the type of trial for which the protection of the Sixth -Amendment is most critical. See id. at 268-71, 68 S.Ct. 499 (discussing the origins of the public-trial right).
In this case, no one disputes that the district court cleared the gallery of all spectators and physically closed the. courtroom before having a discussion with counsel from both sides about the scope of an evidentiary ruling. The evidentiary, ruling prohibited Smith from having certain witnesses testify that one of the victims had previously burglarized his home. The district court’s reason for the closure — to keep the media from -printing the identity of the witnesses and the content of their potential testimony — was plainly unacceptable in light of the purposes underlying the Sixth Amendment public-trial right and the press’s First Amendment right of access to the courts. See id.; see also Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603-06, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (explaining the relationship between the' Sixth Amendment public-trial right and the First Amendment right of access to criminal trials). Nevertheless, I reach the same conclusion as the court: the closure in this case did not violate :the Sixth Amendment. I do so not because I view the closure as trivial or administrative, as the court does,[1] but because I am unconvinced that the closure here occurred during Smith’s “trial.” U.S. Const, amend. VI; Minn. Const, art. I, § 6. Therefore, I concur only in the judgment with respect to Part III of the court’s opinion.[2]
I:
This case involves the prosecution of Byron David Smith for the shootings of Nicholas Brady and Haile Kifer, two teenagers shot by Smith during a burglary of his home. A major theory’ of Smith’s defense was that, in shooting Brady and Kifer, he was acting to defend his home *338 against-burglars whom he believed might be armed and dangerous. The district court allowed Smith to present evidence of the previous burglaries of his home and evidence that the burglars had stolen a shotgun during one of those burglaries. However, the parties disagreed about whether Smith could present evidence that Brady, one of the two victims, was involved in the burglaries. Smith sought to introduce evidence of Brady’s participation through three witnesses: Brady’s mother and two of Brady’s friends, C.K. and J.K., both of whom allegedly had been involved in previous burglaries with Brady.
The district court considered arguments on that issue on Thursday, April 17, 2014, during a hearing in open court. Smith’s counsel argued that he should be able to present evidence of Brady’s participation in the burglaries through the testimony of Brady’s alleged co-participants, C.K. and J.K., whom he identified by name. When the court next convened, on the morning of Monday, April 21, 2014, the judge “cleared the courtroom,” including “the spectator gallery,” which resulted in only the defendant, the attorneys, and court staff .being present in the courtroom. Defense counsel objected to the closure, but the district court overruled the objection. The court then explained that it would not allow Smith to present testimony about Brady’s prior bad acts, or the involvement of J.K. or C.K. .in the prior burglaries, because Smith did not know who had previously burglarized his home. The court then explained .its reason for clearing the courtroom:
[T]he court is not allowing the press in for this ruling, because otherwise it could be printed, and indeed, while the jurors hopefully will follow the admonition not to read or hear anything in the press and TV and such in the meantime while this case is pending, certainly the media would publish and print the substance of the court’s pretrial ruling, and then of course it runs the risk of getting to the jury if for some reason they don’t adhere to their oath.
After further clarifying the scope of its ruling and permitting the-parties to have a brief off-the-record conversation, the district court reopened the courtroom. The jury entered' a short time later, at 10:08 a.m.
Essentially .simultaneously, at 10:00 a.m., the court filed a written order, which the court made, available to the public, ruling that Smith would be allowed to present evidence of the previous burglaries only through the testimony of law-enforcement officers, not “through more prejudicial means (i.e., through the testimony of Brady’s mother or of a perpetrator of the prior break-ins).” The order did not identify J.K. or C.K., and therefore provided less information to the public than would have otherwise been available had the courtroom been open that morning.
II.
The public-trial right, guaranteed by the Sixth Amendment to the United States Constitution, has an “obscure” historical pedigree. In re Oliver, 333 U.S. 257, 266, 68 S.Ct. 499, 92 L.Ed. 682 (1948). The right has its roots in the English common law, see id., and it first appeared in the Pennsylvania and North Carolina Constitutions in 1776, see Pa. Const. Declaration of Rights IX (1776); N.C, Const. Declaration of Rights IX (1776). Since then, nearly every state has adopted a rule, typically one of constitutional weight, requiring criminal trials., to be open to -the public. See Oliver, 333 U.S. at 267-68, 68 S.Ct. 499; see also 21A Am. Jur; 2d Criminal Law § 967 (2016) (collecting cases). Generally, no phase of a criminal trial is exempt from the public-trial guarantee. *339 State v. Benton, 858 N.W.2d 535, 540 (Minn.2015) (citing State v. Brown, 815 N.W.2d 609, 617 (Minn.2012)); see also Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 564, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (plurality opinion) (“[T]hroughout its evolution, the trial has been open to all who care to observe.”).
In addition to its English common-law heritage, the public-trial right was in part a response to certain historical practices. Specifically, a “distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy’s abuse of the lettr'e de cachet.” Oliver, 333 U.S. at 268-69, 68 S.Ct. 499 (footnotes omitted). These controversial practices, which permitted a summary determination of guilt (lettres de cachet) or entailed conducting some criminal proceedings in’ secret (Star Chamber), were discontinued' based on their unpopularity. See id, at 268-69, nn. 21-23, 68 S.Ct. 499. The Star Chamber,' for example, was in tension with the common law tradition of open criminal trials that began before the Norman Conquest. See Press-Enter. Co. v. Superior Court, 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). The Bill of Rights, including the Sixth Amendment', “was enacted against th[is] [historical] backdrop.” Richmond Newspapers, 448 U.S. at 575, 100 S.Ct. 2814 (plurality opinion). The public-trial right became “a safeguard against any attempt to- employ [the] courts as instruments of persecution.” Oliver, 333 U.S. at 270, 68 S.Ct. 499. Yet despite the basic command in the Sixth Amendment that criminal trials are to be open to the public, courts have long disagreed about the scope of the public-trial right and to what types of legal proceedings the right attaches. See United States v. Kobli, 172 F.2d 919, 922 (3rd Cir.1949) (describing the discord among courts as to the scope of the Sixth Amendment’s public-trial guarantee).
A.
What is not reasonably subject to debate is that the district court’s reasons for closing the courtroom in this casé conflict with the history and rationale of the-public-trial right. The court closed the courtroom because of its concern that, -due to the high-profile nature of the-case, “the media would publish and print the substance of the court’s pretrial ruling.” To. be fair, the court’s concern was not motivated by hostility to the media, but rather by the possibility, hypothetical at that point, that jurors would not “adhere to their oath” and would read press accounts of the pretrial proceedings, including the.substance of the court’s pretrial- ruling to exclude certain testimony.
■ Such hypothetical and speculative concerns, however, do not justify the closure of a trial. The “right to a ... public trial” is listed first (along with the speedy-trial right) among a whole series of trial rights that accrue to criminal defendants. This placement, as well as -its history, suggests that the public-trial right is a: structural protection, like the impártiál-jury requirement, that safeguards the other rights enumerated in the Sixth Amendment, including the rights to counsel, to confront one’s accusers, and to compulsory process. See Freytag v. Comm’r of Internal Revenue, 501 U.S. 868, 896, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring in part) (noting that: the public-trial right “provide[s] benefits to society” that resemble structural guaraiitees); As-.the Supreme Court of the United., States has stated, ,
[t]he requirement- of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the *340 presence of interested spectators may-keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.
Waller v. Georgia, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (quoting Oliver, 333 U.S. at 270 n. 25, 68 S.Ct. 499).
Moreover, as the Supreme Court recognized in creating a corollary right of access to the- press under the First Amendment, open criminal trials play an important role in ensuring confidence in government:
■The value of openness lies in the fact that people not actually attending trials can have confidence that standards of ■fairness are being observed; the sure knowledge that am/one is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.
Press-Enter., 464 U.S. at 508, 104 S.Ct. 819. The media’s access to the trial is essential to achieving these objectives. The media often “function[ ] as surrogates for the public,” Richmond Newspapers, 448 U.S. at 573, 100 S.Ct. 2814, serving as conduits for the dissemination of information “‘to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.’ ” Id. at 592-93, 100 S.Ct. 2814 (quoting Cox Broad. Corp. v. Cohn, 420 U.S. 469, 492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975)). In short, the public cannot serve as a check on abuses of justice if the trial is conducted behind closed doors. -,
Thus, three flaws underpin the district court’s reasoning. First, the concern that the press might publish an account "of a proceeding should weigh in favor of keeping the courtroom doors open, not against it, because press coverage serves the important structural safeguard of opening the judicial process to public inspection. This is especially true when the concern motivating the closure — having the jurors learn the identity -óf witnesses who would be favorable to Smith’s claim of self-defense and the content of their potential testimony — was not a threat to Smith’s right to a fair trial. See Waller, 467 U.S. at 45,104 S.Ct. 2210 (stating that the right to “an open trial may give way in certain cases to, other rights or interests, such as the defendant’s right to a fair trial or the government’s interest in inhibiting disclosure of sensitive information”). -
Second, the court’s reasoning applies to every instance in which a court elects to conduct proceedings outside of the hearing of the jury: if the press and the public are present for such proceedings, then there is always the possibility that the information might somehow reach the jury. But such a hypothetical possibility cannot justify closing the courtroom. Cf. Minneapolis Star & Tribune Co. v. Kammeyer, 341 N.W.2d 550, 557-58 (Minn. 1983) (discussing the constitutional prerequisites to closure of pretrial hearings based on a concern that the defendant will be prejudiced). Indeed, the Minnesota Rules of Criminal Procedure, provide alternatives to closure that minimize the risk that potentially prejudicial information will reach the jury. Such alternatives include, among others, sequestering the jury, Minn. R.Crim. P. 26.03, subd. 5; admonishing the jurors not to “read, listen to, or watch news reports about the case,” id., subd. 9; and questioning each juror if potentially prejudicial material is “disseminated outside the trial proceedings,” id., subd. 10. - Yet aside from providing a general admonishment to jurors warning them not to read press accounts or watch coverage of the trial, the district court did not explore any of these alternatives, at *341 least not on the record. Instead, the court just decided to exclude the press and the public, without making any findings supporting the closure. See Waller, 467 U.S. at 48, 104 S.Ct. 2210 (requiring a district court to make certain findings before closing the courtroom); Minn. R.Crim. P. 26.03, subd. 6(5) (requiring a district court to issue a written “order and supporting findings of fact” when making a decision to restrict “public access” to “portions of the trial conducted outside the presence of the jury”).
Third, the procedure selected by the court — closure of the courtroom — was unlikely to achieve its desired effect. The district court was concerned that its ruling, and the identity of the witnesses subject to the ruling, would reach jurors, but the court’s-April 21, 2015 order, which denied Smith’s request to. have Brady’s mother and two other .witnesses testify about Brady’s role in prior burglaries, was available to the media. Any member of the media who attended the open hearing on April 17, 2015, when the. court heard arguments from counsel and considered the potential testimony of these witnesses, would have been able to piece together the subject and scope of the court’s evidentiary ruling and publish a story about it. Accordingly, the closure had the effect of depriving the proceedings of at least some of their appearance of legitimacy for only the' most marginal of benefits to. the objective of maintaining an impartial jury.
I do not mean to suggest that a district court can never close a courtroom during a criminal’trial, regardless of the interests involved. Clearly, there are instances in which closure of the courtroom is not only acceptable, but may be required. See Waller, 467 U.S. at 45, 104 S.Ct. 2210. However, for any closure during a trial to meet constitutional requirements:
[T]he party seeking to close the hearing must advance, an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure. ■ -
Id. at 48,104 S.Ct. 2210.
If we were to apply the Waller factors to the courtroom closure in this case, there is little doubt that the closure would fail them. Even if the hypothetical possibility that jurors would learn about Brady’s pri- or burglary attempts was an “overriding interest that [was] likely to be prejudiced” — itself a dubious conclusion — there is no question that the district court failed to consider “reasonable alternatives to closing the proceeding” or to “make findings adequate to support the closure.” Id. Accordingly, whether the closure in this case violates the public-trial right depends on whether the closure, occurred during “trial,” which is the proceeding to which the right. attaches. See U.S. Const, amend. VI (granting “the accused ... the right to a speedy and public trial”); see also Presley v. Georgia, 558 U.S. 209, 212, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010) (asking whether' the right to a public trial “extends” to jury selection); id. at 217-18, 130 S.Ct. 721 (Thomas, J., dissenting) (framing the question as whether jury voir’ dire was • covered by the ’“Sixth Amendment’s ‘[P]ublie [T]riaF Clause” (alteration in original)).
B.
The most analytically difficult question in .this case is whether the district court’s explanation of a pretrial evidentiary ruling constitutes a part of the “trial” to which the public-trial right attaches. In discussing the First Amendment right of access *342 to the courts, we have noted that, “at common law,' there was no tradition of public access to pretrial proceedings.” Kammeyer, B41 N.W.2d at 555.- Similarly, the United States Court of Appeals for the Fifth Circuit has rejected the application of the public-trial right, to discussions of pretrial evidentiary rulings, reasoning that a “routine evidentiary ruling is rarely determinative of the accused’s guilt or innocence” and that such discussions “ordinarily pose no threat of judicial, prosecutorial or public abuse.” See United States v. Norris, 780 F.2d 1207, 1210 (5th Cir.1986). The Norris approach, which does not extend the Sixth Amendment public-trial right to discussions.of routine evidentiary matters and other administrative tasks, appears to be the majority rule. See, e.g., United States v. Valenti, 987 F.2d 708, 714 (11th Cir.1993); United States v. Gurney, 558 F.2d 1202, 1210 (5th Cir.1977); State v. Reed, 302 Kan. 227, 352 P.3d 530, 540-42 (2015); State v. Smith, 181 Wash.2d 508, 334 P.3d 1049, 1052-55 (2014). I am less confident than the court, however] that Norris and these other cases draw the constitutional line in the right place.[3]
My doubt is rooted in the Supreme Court’s decision in Waller v. Georgia, which predated Norris by 2 years. 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). In Waller; the Court considered whether the Sixth Amendment required a courtroom to be open during a 7-day pretrial suppression hearing in which the legality and admissibility of wiretap recordings were at issue. See id. at 41^2, 104 S.Ct. 2210. The-trial court had closed the hearing because of the potential application of a Georgia law that rendered wiretap ■ recordings inadmissible if they were published for any purpose other than a “ ‘necessary and essential’ ” one. See id. (quoting Ga.Code Ann. § 16 — 11—64(b)(8) (1982)). After the trial, the transcript of the closed hearing was released to the public. See id. at 43,104 S.Ct. 2210.
The "Supreme Court unanimously held that the public-trial right extended to the pretrial suppression hearing in Waller. See id. at 47, 104 S.Ct. 2210. It reásoned that the “aims and interests” underlying the public-trial-right “are no less pressing in a hearing to suppress wrongfully seized evidence” and that “suppression hearings often are as important as the trial itself.” Id. at 46, 104 S.Ct. 2210. In reaching its decision, the Coürt focused on the fact that “a suppression hearing often resembles a bench trial: witnesses are sworn and testify[,] ... [and] [t]he outcome frequently depends on a resolution of factual matters.” [4]' Id. at 47,104 S.Ct. 2210.
*343 One of the lessons from Waller is that a closure is less likely to be constitutionally acceptable when a hearing involves live witness testimony, which is one of the reasons that I cannot join Part III of the Court’s opinion. I understand the court to be holding — categorically, in fact — that a district court may close the courtroom during administrative proceedings and when making routine evidentiary rulings, whether in a bench conference or in another setting, without violating the Sixth Amendment.
In my view, however, the court’s rule focuses on the wrong question. The question is not whether the task is administrative or legal, as the court seems to suggest. Rather, the relevant question is whether a criminal proceeding resembles, and thereby possesses the characteristics of, a bench or jury trial. See United States v. Thompson, 713 F.3d 388, 393 (8th Cir.2013) (concluding that the public-trial right applies to sentencing hearings, largely because they are. “trial like” proceedings). When a criminal proceeding involves the presentation of witness testimony, the arguments of counsel on a disputed question, or invocation of the court’s fact-finding function, it is more likely to be subject to the requirements of the Sixth Amendment, whether or not it involves what appears to be an administrative task or a routine evidentiary motion.[5] See, e.g,, Rovinsky v. McKaskle, 722 F.2d 197, 200-02 (5th Cir.1984) (extending the Sixth Amendment’s public-trial right to a hearing on motions in limine); Commonwealth v. Jones, 472 Mass. 707, 37 N.E.3d 589, 603-08 (2015) (extending the Sixth Amendment public-trial right to hearings on the application of Massachusetts’ rape-shield law).
In this case, because all of the trial-like aspects of the proceedings — specifically, the consideration of witness testimony and the arguments of counsel — occurred during a hearing in open court on April 17, 2014, I would conclude that Smith’s right to a public trial was not violated. Aside from discussing the scope of the court’s written order, nothing else occurred during the brief hearing on the morning of April 21, 2014 that resembled a bench or jury trial. Accordingly, although the district court should not have closed the courtroom on the morning of April 21, see Minn. R.Crim. P. 26.03, subd. 6 (creating rules for “closed hearing[s]”), I cannot conclude under these facts that the closure violated Smith’s rights under either the Sixth Amendment to the United States Constitution or Article I, Section 6 of the Minnesota Constitution.

. To be sure, this court has used the term "trivial” to describe those closures that do not implicate a criminal defendant’s Sixth Amendment public-trial right. See, e.g., State v. Silvernail, 831 N.W.2d 594, 600-01 (Minn. 2013); State v. Brown, 815 N.W.2d 609, 617-18 (Minn.2012); State v. Lindsey, 632 N.W.2d 652, 660-61 (Minn.2001). Yet I remain unpersuaded that any of these cases actually involved courtroom closures. See United States v. Thompson, 713 F.3d 388, 394-95 (8th Cir.2013) (describing the differences between complete and partial closures of a courtroom). In each of them, the district court never cleared the gallery of all spectators; members of the press or public were always present; and the defendant, his family, his friends, and witnesses were never improperly excluded. See Sheppard v. Maxwell, 384 U.S. 333, 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (stating that the “courtroom and courthouse premises are subject to the control of the court”).

. I join the remainder of the court’s opinion.

. Norris, the principal case relied upon by the court, may not extend quite as far as &e court suggests. Just 2 years earlier, the United States Court of Appeals for the Fifth Circuit decided Rovinsky v. McKaskle, in which it concluded that a trial court violated a criminal defendant’s Sixth Amendment right to a public trial when it decided to conduct closed proceedings on a motion in limine seeking to restrict defense counsel’s cross-examination of prosecution witnesses. 722 F.2dT97, 200-02 (5th Cir.1984).' The subject matter of the motion in this case closely resembles the motion from Rovinsky.

. The Supreme Court’s examination of whether the pretrial suppression hearing in Waller “resemble[d] a bench trial,” as well as its , holding in that case, suggest that the inquiry under the Sixth Amendment is functional rather than formal. A formal approach would consist of determining only whether a particular proceeding is, in fact, part of the “trial-.” A functional approach, by contrast, is flexible: the focus is on whether a particular proceeding is the functional equivalent of a trial. Cf. N.L.R.B. v. Noel Canning, — U.S.-,-, 134 S.Ct. 2550, 2563, 189 L.Ed.2d 538 (2014) (adopting a functional definition of the word "recess” in the Recess Appointments Clause of the United States Constitution). Waller’s approach' of comparing and contrasting the characteristics of pretrial suppression hearings and trials is indicative of a *343 functional approach to questions regarding the scope of the public-trial right.

. Sidebar conferences during trial, which the court conducts outside the earshot of the jury, are constitutionally distinct from the types of proceedings at issue here. In contrast to chambers conferences or closed evidentiary hearings, sidebar conferences permit members of the public to view the conduct of the attorneys and the judge, even if members of the gallery cannot hear what the attorneys and the judge are saying. See People v. Virgil, 51 Cal.4th 1210, 126 Cal.Rptr.3d 465, 253 P.3d 553, 578 (2011) (noting that it cannot find any cases holding that "sidebar conferences” during trial "are akin to a closure of the courtroom”). In such a situation, the trial itself remains open and public, which is all that the Sixth Amendment requires.