STATE OF MINNESOTA

IN SUPREME COURT

A14-0941
A15-0300

Morrison County

Lillehaug, J.
Concurring, Stras, J.
Took no part, Hudson, J.

State of Minnesota,

Respondent (A14-0941),
Appellant (A15-0300),

vs.

Filed:  March 9, 2016
Office of Appellate Courts

Byron David Smith,

Appellant (A14-0941),
Respondent (A15-0300).

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Brian Middendorf, Morrison County Attorney, Peter J. Orput and Brent D. Wartner, Special Assistant Morrison County Attorneys, Stillwater, Minnesota, for respondent/appellant State of Minnesota.

Steven J. Meshbesher, Adam T. Johnson, Meshbesher & Associates, P.A., Minneapolis, Minnesota, for appellant/respondent Byron David Smith.

John P. Borger, Leita Walker, Faegre Baker Daniels LLP, Minneapolis, Minnesota; and Randy M. Lebedoff, Minneapolis, Minnesota, for amicus curiae Star Tribune Media Company, LLC.

_____

1

1.    The district court did not err in denying the defendant's motion to dismiss the indictment based on five separate, individually alleged errors.

2.    The cumulative effect of the five alleged errors in the indictment process did not deprive the defendant of a fair grand-jury proceeding.

3.    The nonpublic proceeding to discuss the district court's ruling on a pretrial evidentiary issue did not violate the defendant's Sixth Amendment right to a public trial.

4.    The district court did not violate the defendant's constitutional right to present a complete defense by excluding four pieces of evidence.

5.    Because the prosecutor did not commit misconduct in closing argument, the district court did not err in failing to give a curative jury instruction.

6.    The district court erred when it determined that the defendant's restitution affidavit was timely under Minn. Stat. § 611A.045, subd. 3(a) (2014).

Affirmed in part and reversed in part.

O P I N I O N

LILLEHAUG, Justice.

Byron David Smith was convicted of two counts of first-degree premeditated murder related to the shooting deaths of two people.  On direct appeal, Smith argues that the district court committed four types of error.  The State, in turn, argues that the district court committed error in determining the appropriate restitution for the victims' families. We affirm the convictions and reverse the district court on the issue of restitution.

## I.

This murder case arises out of the deaths of Nicholas Brady and Haile Kifer, who Smith killed in his home on Thanksgiving Day 2012. Smith, who lived in Little Falls, was the victim of a series of burglaries at his home. During a burglary on October 27, 2012, valuable items were taken, including a shotgun and a rifle. Smith notified the police, who investigated the crime. The intruder left a shoe print on the panel of the basement door when kicking it in. The police were unable to determine who was responsible for the break-in.

Smith was having trouble sleeping and was unhappy because of the break-ins. Smith suspected that his female neighbor, A.W., and her parents might be responsible for the break-ins. Smith's neighbor, W.A., told Smith that he believed A.W. and her parents were watching Smith's house to see when he came and went. Worried that the burglar would return, Smith started to carry his gun in the house.

Around 10:30 a.m. on Thanksgiving morning, November 22, 2012, Smith and W.A. were talking outside of W.A.'s residence when they saw A.W. drive by. Less than an hour later, Smith moved his vehicle from his garage, which faced the street, and parked it several blocks away, outside of the home of two state troopers. Smith later told investigators that he had moved his car because he wanted to clean his garage and protect his car from vandalism. Smith then walked back to his residence, returning at 11:45 a.m. He walked through his backyard, which faced the river, instead of approaching the main entry of his house from the street.

3

Around noon, Smith went down to his basement and turned on a digital audio recorder. He sat down in an upholstered reading chair facing the side of the basement stairwell. Smith had a novel, a water bottle, and some snack bars. On his belt clip was a nine-shot revolver. Steps away from the reading chair was Smith's loaded mini-14 rifle. Smith's outdoor video surveillance system was running. In the adjacent basement workroom was a screen showing pictures from four security cameras placed around the exterior of Smith's home.

The events that followed were captured on Smith's audio recorder. About 11 minutes after turning on the recorder, Smith said, "In your left eye."[1] A little over 17 minutes into the recording, Smith said, "[B.], uh stop by tomorrow morning. No rush but as soon as convenient. Can you do that? Yea. Uh, park to the north, 100 feet nor . . . 100 yards north of the corner and walk from the west."[2] Almost 23 minutes into the audio recording, Smith said, "I realize I don't have an appointment but I would like to see one of the lawyers here."

At 12:33 p.m., Nicholas Brady approached Smith's house, looked into the windows, and tried the doorknobs. Smith heard the doorknobs rattling, saw a shadow in front of the picture window in the basement, and listened as Brady walked across the deck. Then glass broke upstairs, which was the sound of Brady breaking and entering

---

[1]    One of the shots Smith later fired struck Kifer by her left eye.

[2]    B. is Smith's brother. Smith did not call his brother until much later in the evening. The prosecution's theory was that Smith was rehearsing what he would say after he encountered burglars.

4

through Smith's bedroom window. Brady approached the basement stairs. Below, Smith sat waiting.

As Brady descended the stairs, Smith saw Brady's feet, his knees, and then his hip. Smith shot Brady in the chest with the rifle. Smith later told investigators that he had not seen Brady's hands when he fired.

Smith shot Brady a second time. Brady tumbled down to the basement floor, face up. Three seconds later, at close range, Smith shot the groaning Brady. The bullet went through Brady's hand and then through the side of his head. Smith said to Brady, "You're dead."

Smith retrieved Brady's shoes, which had fallen off when Brady fell down the stairs, and put them under his reading chair. Grabbing a tarp from near the basement fireplace, Smith put Brady on the tarp and dragged him to the adjoining workroom. Smith reloaded his rifle.

About 10 minutes after Brady entered and about 8 minutes after the shooting, Haile Kifer entered Smith's house. Kifer quietly called out, "Nick." Hearing no response, she started down the basement stairs. She again said, "Nick." Just as he had with Brady, Smith fired when he saw Kifer's hips, but before he saw her hands. Smith later told the police that his first shot was at "what [he] would consider point blank range."

Kifer tumbled down the steps. Smith tried to shoot her again, but his rifle jammed. Smith commented, "Oh, sorry about that." Kifer exclaimed, "Oh my God!" Smith pulled out his revolver and shot her. Amidst Kifer's screams, Smith shot her a

third time and a fourth time.[3]  Smith said, "You're dying!"  Kifer screamed.  Smith shot her a fifth time.  Calling her "bitch," Smith dragged Kifer into the workroom and placed her on the tarp on top of Brady's body.  But Kifer was not yet dead, so Smith shot her a sixth and final time.

For the next 5 hours after the shootings, Smith stayed in his house.  The audio recorder captured Smith talking to himself.  His statements included:

"I left my house at 11:30.  They were both dead by 1."

"Of course.  I'm safe now."

"Cute.  I'm sure she thought she was a real pro."

"You're dead."

"I am not a bleeding heart liberal.  I felt like I was cleaning up a mess.  Not like spilled food.  Not like vomit.  Not even like . . . not even like diarrhea.  The worst mess possible.  And I was stuck with it."

"In some tiny little respect . . . in some tiny little respect  .  .  . I was doing my civic duty.  If the law enforcement system couldn't handle it, I had to do it.  I had to do it."

"The law system couldn't handle her and if it fell into my lap and she dropped her problem in my lap . . ."

"And she threw her problem in my face.  And I had to clean it up."

"They weren't human.  I don't see them as human.  I see them as vermin.  Social mistakes.  Social problems.  I don't see them as . . . human.  This bitch was going to go through her life, destroying things for other people.  Thieving, robbing, drug use."

---

[3]     The prosecution and defense disagree on whether Kifer also said "I'm sorry" between the third and fourth shots.  We discuss this disagreement below.

"It's all fun. Cool. Exciting. Highly profitable. Until somebody kills you."

"It's a sucker shot. People going down strange stairs naturally watch the steps."

"Like I give a damn who she is."

"It's not a mess like spilled food. It's not a mess like vomit. It's not even a mess like diarrhea. It's far worse. Then they take slice after slice out of me."

"Five thousand. Five thousand dollar slice. Ten thousand dollar slice. And if I gather enough evidence, they might be prosecuted. If they're prosecuted it might go to court. If it goes to court, they might be found guilty."

"If they're found guilty they might spend . . . 6 months, 2 years in jail and then they're out, and they need money worse than ever and they're filled with revenge. I cannot live a life like that."

"I cannot have that chewing on me for the rest of my life. I cannot . . . I refuse to live with that level of fear in my life. I refuse to live with that level of fear in my life."

"She's tough. She's eye candy. It's [inaudible] games. It's exciting. It's highly profitable. Until somebody kills you. Until you go too far and somebody kills you. Until you take advantage of somebody who's not a sucker."

"Mother and father are semi-psychotic, are both semi-psychotic. I put even odds that one or the other will come over here with a gun."

Smith did not call law enforcement on November 22. As he later explained, "I was sitting [there] afraid that most likely the brass plated bitch would nag [him] into it and he would come over with a gun to see what had gone wrong. I was sitting there

afraid."[4]  Smith also said that he did not want to ruin the Thanksgiving holiday for law enforcement.

The next day, November 23, Smith spoke to W.A. on the telephone and asked W.A. to find him a lawyer.  Later, Smith asked W.A. to contact the sheriff's office.  Smith advised W.A. that he had solved the break-ins in the neighborhood.

W.A. called the sheriff's department.  Over the course of several conversations with dispatch and department personnel, W.A. asked that Sergeant Luberts, who had investigated the burglaries at Smith's residence, respond to Smith's residence as soon as he was available.  A short time later, Sergeant Luberts and another deputy arrived.

As the peace officers approached the house, Smith "came out of the door with his hands up and said he needed to tell [them] something."  After leading the officers into his home, Smith explained that he was a victim of previous burglaries, the most recent occurring the day before, on Thanksgiving.  Smith led the officers to his bedroom to see the broken glass.  Then Smith told the officers he needed to show them something in the basement.  There the officers saw the bodies of Kifer and Brady on the tarp.

Smith told the officers how he shot a man coming down the steps.  Smith explained that he wanted the person dead and shot him until he was dead before dragging him onto the tarp.  Smith described how he shot a woman coming down the steps.  Smith said that he shot the woman again after she fell to the bottom of the steps, this time aiming for her heart.  Smith told the officers that after he dragged the woman into the

---

[4]      Smith seemed to be referencing A.W.'s parents.

8

workroom, he noticed she was still gasping for breath, so he shot her. Smith explained that he thought the woman was his neighbor, A.W.

The officers arrested Smith and took him to the sheriff's office for questioning. During Mirandized interrogations, Smith reviewed the burglaries leading up to and including the Thanksgiving shootings. For the past month, Smith had "felt very threatened." When he heard people coming down the stairs of the basement, Smith believed they were the burglars who stole his guns. He added, "I figured they're willing to use guns if they steal guns and I decide[d] that I've got a choice of either shooting or being shot at."

Smith described how he killed Brady as he came down the stairs. "I saw his feet, and then I saw his legs, and when I saw his hips I shot." When the investigator asked whether Smith saw Brady's hands when Brady came down the steps, Smith added, "I didn't see his hands at that point." Smith explained how Brady tumbled to the floor. "And he's looking face up at me. . . . [And] I shoot him in the face." "I want[ed] him dead." After he shot Brady, Smith sat back down in the chair and his adrenaline was going—"I just . . . wanted to calm down more than anything else."

Smith also described how he shot Kifer in the hip as she came down the stairs. Again, Smith shot before he saw her hands, and when she fell on the ground, "[h]er hands were open but she would have dropped anything she was carrying." But he was "not going to ask if there's a gun. . . . You know people who steal guns I don't want to give them the chance to shoot me. . . . She could have or might not have had a gun in her hands."

Smith also elaborated on why he killed the woman he thought was A.W.:

> And thinking back on it what happened was—everybody has red buttons. Everybody has sore spots. And I've known since grade school that being ganged up on is a sore spot with me. I just wasn't thinking. I didn't think. I wasn't thinking. I was just; they're ganging up on me so I killed her too.

Smith thought that Kifer laughed at him when his rifle jammed. "It wasn't a very long laugh [be]cause she was already hurting." He explained, "[T]here was another red button I guess most people would have, so if you're trying to shoot somebody and they laugh at you, you go again. . . . I fired more shots than I needed to." When asked, "Why did you fire more shots than you needed to do you figure?," Smith replied, "[A .22] is a peashooter and I was very, very threatened, unhappy." Smith was asked, "You were mad, correct?" Smith responded, "Yes."

Smith described how he dragged Kifer to the tarp, and explained: "Ah, after she was on the tarp she was still gasping. . . . And as much as I hate someone I don't believe they deserve pain so I gave her a [not discernable] shot under the chin up into the cranium." "I thought she was dead and it turned out she wasn't. . . . So, ah, I did a good clean finishing shot." "And, ah, she gave out the death twitch. First time I've ever seen it in a human, but it works the same in beaver, and deer, and whatever."

Smith explained how he checked Kifer's shoes to see if the tread pattern matched the shoe print left on the basement door from the October 27 burglary. When he determined Kifer's shoes did not match, he checked Brady's shoes. Smith thought Brady's tread pattern might match and that law enforcement would need to investigate further.

10

Toward the end of the interrogation, Smith recounted the previous burglaries at his home. Smith explained that even after he started locking his doors, "the dogs had eaten well enough at the garbage pail they kept returning." Smith also said that he "now realize[d]" that parking far away was likely the impetus for the burglars to come— "[b]ecause they thought [he] was gone." Smith had never parked his car in that location before.

Smith was charged by complaint with two counts of second-degree murder. A grand jury then indicted Smith on two counts of first-degree premeditated murder. Smith moved to dismiss the indictment. The district court denied the motion. The court of appeals denied Smith's petition for discretionary review. *State v. Smith*, No. A13-2276, Order (Minn. App. filed Jan. 14, 2014), *rev. denied* (Minn. Mar. 18, 2014).

At trial, Smith's main defenses were that he used reasonable force in defense of himself and his dwelling. The judge instructed the jury that the State had the burden of proving beyond a reasonable doubt that Smith did not use reasonable force. Following trial, a jury found Smith guilty of two counts of second-degree murder and two counts of first-degree premeditated murder. The district court convicted Smith of two counts of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2014), and sentenced him to two concurrent life sentences without the possibility of release. Smith appealed.

At Smith's request, we stayed his appeal pending a restitution hearing. The Brady and Kifer families' restitution requests included the estimated cost of a headstone for each victim. The district court initially awarded Kifer's family the full amount requested, but reserved for hearing the determination of the appropriate amount of restitution for

11

Brady's family. The issue was whether restitution should be reduced due to Brady's alleged involvement in previous burglaries of Smith's home.

The district court reminded Smith that he needed to submit a detailed, sworn affidavit setting forth all challenges to the restitution requests and otherwise meeting the requirements of Minn. Stat. § 611A.045, subd. 3(a) (2014). But Smith's affidavit did not specifically challenge the restitution awards for the headstones, and he did not contest the amount of the awards until after the hearing. The district court ultimately denied the Kifer and Brady families' requests for restitution to cover the estimated cost of the headstones. Thereafter, the State appealed from the district court's restitution order, we reinstated Smith's direct appeal, and we consolidated the two appeals.

Smith argues that the district court: (1) erred when it denied his motion to dismiss the indictment; (2) erred when it briefly closed the courtroom to spectators and the press; and (3) violated his constitutional right to present a complete defense by excluding certain evidence. Smith also argues that (4) the prosecutor committed misconduct in his closing argument and the district court erred when it failed to issue a cautionary instruction to the jury. The State contends that the district court abused its discretion by: (1) allowing Smith to challenge the restitution request for the estimated expenses of the victims' headstones; and (2) denying restitution for the victims' headstones when estimates were available. We consider each alleged error in turn.

## II.

We first must decide whether the district court committed reversible error when it denied Smith's motion to dismiss the indictment for individual and cumulative errors.

12

Smith raises five separate errors: (1) the indictment was issued without the deliberation and vote of the grand jury; (2) Smith suffered substantial prejudice when the State attempted to impeach a witness; (3) the prosecutor improperly disclosed to the grand jury that Smith was charged with second-degree murder; (4) the instruction on premeditation erroneously blurred the distinction between first- and second-degree murder; and (5) the State elicited irrelevant "spark of life" evidence from the victims' mothers. The State disputes each argument, but also argues that, cumulatively, the alleged errors do not undermine the probable cause for the indictment or the grand jury's independence.

"A grand jury determines whether 'there is probable cause to believe the accused has committed a particular crime.' " *Dobbins v. State*, 788 N.W.2d 719, 731 (Minn. 2010) (quoting *State v. Greenleaf*, 591 N.W.2d 488, 498 (Minn. 1999)). "A presumption of regularity attaches to the indictment and it is a rare case where an indictment will be invalidated." *Id.* "[A] criminal defendant bears a heavy burden when seeking to overturn an indictment. The burden is heavier for a defendant who raises the issue on direct appeal after he has received a fair trial and been found guilty beyond a reasonable doubt." *Dobbins*, 788 N.W.2d at 731.

## A.

Smith first argues that the indictment was issued without the vote and deliberation of the grand jury because, when they deliberated, the grand-jury members did not have the formal indictment, which differed from the proposed indictment the State read to the jurors before their deliberation. "An indictment may only issue if at least 12 jurors concur. The indictment must be signed by the foreperson, whether the foreperson was

one of the 12 who concurred or not, and delivered to a judge in open court." Minn. R. Crim. P. 18.06.

During the grand-jury proceedings, the State displayed to the grand jury on a screen, and read aloud, a proposed indictment. The State also placed paper copies of the proposed indictment on the table for the jurors to consider during deliberations. Count I of the proposed indictment read, in material part:

> Byron Smith, on or about November 22, 2012, in Morrison County, did *wrongfully*, unlawfully, cause the death of a human being, to-wit: Nicholas Brady, with premeditation and with intent to effect the death of Nicholas Brady, *said defendant using a firearm as a deadly weapon at the time of the offense*.

(Emphasis added.) Count 2, relating to Kifer, was otherwise identical.

After deliberations and in the presence of the grand jury, the foreperson announced that the grand jury had reached a decision to indict. The State then prepared the formal indictment. Substantively, the content of the formal indictment was the same as the proposed indictment, except that the references to "wrongfully" and to "defendant using a firearm as a deadly weapon" were removed from the formal indictment.

In the presence of the grand jury, the prosecutor inquired whether "at least 12 members of the grand jury [were] in agreement with the decisions to indict on Counts 1 and 2, First Degree Murder for the deaths of Haile Kifer and Nicholas Brady." The foreperson responded, "Yes." The State read the formal indictment to the grand jury. The State verified with the foreperson, again in the presence of the grand jury, that the formal indictment was "consistent with the decision of the grand jury." Then, in front of both the judge and the grand jury, the State verified that it read the language of the

14

indictment to the grand jury "word for word" and that the indictment "accurately reflected [the grand jury's] decision in this matter." The foreperson answered "yes" to both questions.

Smith relies primarily on *State v. Grose* to support his argument that the grand jury did not separately deliberate and vote on the formal indictment. 387 N.W.2d 182 (Minn. App. 1986). In *Grose*, the court of appeals found that the jurors did not concur in the indictment because, instead of submitting a final indictment to the grand jury for its approval, the prosecutor "read the proposed indictment to the grand jury, and told them to stop her if they had 'any problems' or wanted to 'add anything.' " *Id.* at 189. The prosecutor had made "a 'substantial' modification of crucial allegations of the indictments." *Id.* at 185. This violation, coupled with multiple other violations, led the district court to dismiss the indictment, and the court of appeals to affirm the district court's decision. *Id.* at 185, 190.

As the State points out, *Grose* is readily distinguishable from this case. Here, the State read the formal indictment to the grand jury "word for word" and then verified with the foreperson, in the grand jury's presence, that the "language accurately reflected its decision in this matter." Further, unlike *Grose*, the change to the proposed indictment was not "substantial" and did not relate to the "crucial allegations" that Smith, on or about November 22, 2012, caused the death of two persons, Brady and Kifer; that he did so with the intent to cause their deaths; and that he did so with premeditation. The grand jury had already voted for each one of these allegations. All changes were immaterial and related to facts not disputed at trial. Therefore, we conclude that the grand jury

15

concurred in the indictment, voting for each and every material allegation contained within it, and the district court did not err when it denied Smith's motion to dismiss the indictment.

B.

Smith next argues that the district court erred when it held that the State's attempt to impeach W.A., Smith's friend and neighbor, although improper, did not warrant dismissal of the indictment. The State's line of questioning before the grand jury dealt with a phone conversation between W.A. and Smith on November 23, the day after the shootings. W.A. told investigators that Smith had asked him, "Could you contact a lawyer for me and get a lawyer down here [so] I could talk to a lawyer?" In the grand jury, W.A. recounted that Smith had asked him to find a lawyer. The State asked W.A. if Smith had told him "what kind of lawyer he needed?" When W.A. said "No," the State asked repeatedly if he was sure he did not recall telling law enforcement that Smith had asked him for "a defense lawyer." The State also tried unsuccessfully to refresh W.A.'s recollection in that regard.

Smith argues that the State's line of questioning tarnished W.A.'s credibility with the grand jury and gave the jurors the impression that Smith had asked for a defense lawyer because he had committed a crime. The State contends that the line of questioning did not have a substantial influence on the grand jury's decision to indict.

To determine whether the district court erred, we apply the *Montanaro* test to allegations of prosecutorial misconduct in front of the grand jury. *State v. Montanaro*, 463 N.W.2d 281 (Minn. 1990) (order). A district court should dismiss an indictment if:

16

(1) "it is clear that the prosecutor knowingly committed misconduct in the presentation of evidence to the [g]rand [j]ury;" *and* (2) "if the misconduct substantially influenced the [g]rand [j]ury's decision to indict in the way it did or if the court is left with grave doubt that the decision to indict was free of any influence of the misconduct." *Id.*

Although we find the prosecutor's persistent line of questioning troubling, it did not substantially influence the grand jury's decision to indict, for two reasons. First, the evidence of probable cause was overwhelming. The State presented the grand jury with considerable direct evidence that shed light on Smith's state of mind, including the audio recording Smith made and his incriminating statements to law enforcement. With the recording and statements in hand, the grand jury could have easily found probable cause independent of the State's questioning of W.A. The existence of probable cause as to Smith's guilt is further confirmed by the trial jury's guilty verdicts. *See State v. Voorhees*, 596 N.W.2d 241, 254 (Minn. 1999).

Second, *Montanaro* is distinguishable. In *Montanaro*, the statements the defendant made to the police after a murder, which contained direct evidence of the defendant's state of mind, were withheld entirely from the grand jury. 463 N.W.2d at 281. By contrast, in this case, the grand jury had all of the information available regarding Smith's state of mind at the time of the shootings—the audio recordings, his statements to the police, W.A.'s testimony, and other evidence. Additionally, W.A. successfully resisted the prosecutor's line of questioning. The proceedings were not tainted.

Because the second part of the *Montanaro* test is not met, the district court did not err when it declined to dismiss the indictment for prosecutorial misconduct.

C.

Smith next argues that the State improperly disclosed to the grand jury that Smith had already been charged with second-degree murder. A grand juror asked the prosecutor, "Can you tell us what [Smith] is currently charged with?" The prosecutor responded, "He was charged by Complaint with two counts of Second Degree Intentional Murder. In order to hold someone to account for premeditated murder in the State of Minnesota, it must be done by grand jury indictment. We cannot charge that by Complaint and sustain it." On Smith's motion to dismiss the indictment, the district court determined that the prosecutor's explanation of the charges was "a clear and proper statement of fact and law." We agree.

Further, the prosecutor's accurate answer did not substantially influence the grand jury's decision to indict. As previously discussed, the grand jury had overwhelming evidence of probable cause. There is no reason to believe that the grand jury indicted Smith because he had already been charged by complaint.

D.

Next, Smith argues that the grand-jury instructions on premeditation failed to distinguish first-degree murder from second-degree murder, and therefore the district court should have dismissed the indictment.

The prosecutor instructed the jury both orally and in writing. The prosecutor's oral instruction to the grand jury stated:

18

> Premeditation means that Byron Smith considered, planned, prepared for, or determined to commit the act before he committed it. Premeditation, being a process of the mind, is wholly subjective and hence not always susceptible to proof by direct evidence. It may be inferred from all of the circumstances surrounding the event. *It is not necessary that premeditation exist for any length of time.* A premeditated decision to kill may be reached in a short period of time. However, an unconsidered or rash impulse, even though it includes an intent to kill, is not premeditated.

(Emphasis added.) The State should have said, "It is not necessary that premeditation exist for *any specific* length of time." *See State v. Moore*, 481 N.W.2d 355, 360-61 (Minn. 1992) ("Premeditation, by definition, requires some amount of time to pass between formation of the intent and the carrying out of the act."). But the written instructions the State provided to the grand jury did include the correct language—"*any specific* length of time." Both instructions also contained the "short period of time" and "rash impulse" sentences.

When a prosecutor has given erroneous instructions to the grand jury, we invalidate an indictment only with a showing of prejudice. *State v. Inthavong*, 402 N.W.2d 799, 802 (Minn. 1987). For Smith to prevail, the grand jury instructions must have been "so egregiously misleading or deficient that the fundamental integrity of the indictment process itself is compromised." *Id.* That was not the case here.

Examining the effect of the erroneous oral instruction on the jury instructions as a whole, *see id.* (noting that instructions to the grand jury should be considered as a whole), the prosecutor's statement was followed by two sentences that spoke to the correct premeditation standard. The prosecutor stated that premeditation "may be reached in a short period of time" and that an "unconsidered or rash impulse . . . is not premeditated."

19

Both of these sentences indicate that premeditation does not have to exist for any specific length of time.  Further, the grand jurors had the correct instruction in writing.  Therefore, the district court did not err when it declined to dismiss the indictment on this ground.

E.

Smith next argues that the spark-of-life evidence the State obtained from the victims' mothers during the grand-jury hearing was entirely irrelevant and tainted the proceeding.  Spark-of-life evidence consists of biographical testimony about the victim, including "a photograph of the victim before the injury occurred." *State v. Fairbanks*, 842 N.W.2d 297, 305 (Minn. 2014).

During the grand-jury proceeding, Kifer's mother testified about her daughter's activities and involvement in high school.  She identified her daughter in three photographs, which were submitted as exhibits to the grand jury.  The photographs were from Kifer's junior year in high school, from a gymnastics event, and from a cousin's wedding.  Brady's mother similarly testified about her son's life, particularly what he loved to do.  She explained the significance of three photographs of Brady, depicting him in eleventh grade, standing up for his uncle's wedding, and with Kifer and his sister.

Whether spark-of-life evidence is admissible in a Minnesota grand-jury proceeding is an issue of first impression.  The district court held that the spark-of-life evidence was not admissible in grand-jury proceedings under current law and the admission of the evidence in this case violated the State's responsibility to ensure that the charges were not improperly motivated.  Ultimately, however, the district court declined to dismiss the indictment.  The State disagrees with the determination that the evidence

20

was inadmissible, and urges us to adopt the same rule that exists for spark-of-life evidence in criminal trials. We have allowed such evidence at trial "so long as it is not an attempt to invoke undue sympathy or inflame the passions of the jury." *State v. Morrow*, 834 N.W.2d 715, 727 (citing *State v. Graham*, 371 N.W.2d 204, 207 (Minn. 1985)). In justifying this rule, we have acknowledged that although "the quality or personal details of the victim's life are not strictly relevant to the issue of who murdered the victim, it would seem to tie unduly the hands of the prosecutor to prohibit any mention of the victim's life." *State v. Graham*, 371 N.W.2d 204, 207 (Minn. 1985). As we said in *Graham*: "The victim was not just bones and sinews covered with flesh, but was imbued with the spark of life. The prosecution has some leeway to show that spark and present the victim as a human being." *Id.*

Although spark-of-life evidence is not highly probative and has the potential for prejudice, we decline to carve out an exception for grand-jury proceedings. We allow spark-of-life evidence in criminal trials, subject to limitations. If we were to hold otherwise for grand jury proceedings, we would be treating this evidence in a unique manner. Indeed, the grand jury is allowed to consider evidence that is inadmissible at trial. *See* Minn. R. Crim. P. 18.05, subd. 1 (listing six types of evidence that are admissible in a grand-jury proceeding but not at trial). It would be odd to hold that the grand jury, solely for spark-of-life evidence, cannot hear evidence that is admissible at trial, particularly when the grand jury must only determine probable cause for the charge—a lesser standard than guilt beyond a reasonable doubt.

21

Thus, we hold that the prosecutor may present evidence to the grand jury showing that the victim existed and was imbued with the spark of life. We caution, however, that prosecutors must use this potentially inflammatory tool with care. A prosecutor who unreasonably relies on spark-of-life evidence to tip the grand jury's decision risks dismissal of the indictment.

In this case, the spark-of-life evidence presented to the grand jury did not taint the indictment. We have previously "affirmed the admission of spark of life photographs 'where the photographs were used to provide background information about the family and to personalize [the victim] and where the number of photographs used for these purposes was small.' " *Morrow*, 834 N.W.2d at 727 (quoting *State v. Scales*, 518 N.W.2d 587, 593 (Minn. 1994)). Here, the prosecutors introduced three photos of each victim and did not use them inappropriately. Similarly, the mothers' biographical testimony was not unreasonable. Further, there was no prejudice, as the other evidence supporting probable cause was more than sufficient.

F.

Finally, Smith argues that even if each grand-jury error was individually harmless, the cumulative effect of the errors deprived him of a fair proceeding. " 'Cumulative error exists when the cumulative effect of the . . . errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased [grand] jury.' " *State v. Penkaty*, 708 N.W.2d 185, 200 (Minn. 2006) (quoting *State v. Johnson*, 441 N.W.2d 460, 466 (Minn. 1989) (internal quotation marks omitted)). On the other hand, where sufficient admissible evidence exists to support a

22

finding of probable cause, coupled with repeated reminders to the grand jury of its independence, the district court's denial of a motion to dismiss an indictment for cumulative error is proper. *Penkaty*, 708 N.W.2d at 200.

In this case, even assuming all of the errors argued by Smith were in fact errors, the prosecutors submitted more than sufficient evidence to the grand jury to establish probable cause. During the course of the proceedings, the district court also reminded the grand jury of its independence. The court told the grand jury it was a "completely independent body, answerable to no one." The court explained that the determination of whether to return an indictment was the grand jury's own responsibility, and it added that the jury members were "not [t]here to act as a rubber stamp for anyone." Accordingly, the cumulative effect of the alleged errors did not deprive Smith of a fair proceeding.

### III.

We next consider Smith's argument that the district court violated his Sixth Amendment right to a public trial when it closed the courtroom to the public[5] to discuss its written order on the admissibility of certain testimony. The courtroom closure occurred at the beginning of trial on April 21, 2014, shortly after the case was called but before the jury took its final oath and began to hear argument and testimony.

The closure was the sequel to a pretrial hearing on April 17, 2014, which was open to the public. That hearing was on motions in limine, including the issue of the extent to

---

[5]     Star Tribune Media Company, LLC is a nonparty amicus, and therefore we need not reach its separate First Amendment argument. *See League of Women Voters Minn. v. Ritchie*, 819 N.W.2d 636, 645 n.7 (Minn. 2012) ("Generally, we do not decide issues raised by an amicus that are not raised by the litigants themselves.").

23

which Smith could offer evidence of the previous burglaries of his house. Smith argued that he should be able to call Brady's mother and Brady's friends, C.K. and J.K., as witnesses to testify to Brady's involvement in the previous burglaries. Defense counsel discussed Brady's alleged co-participants by name at the hearing, so those names were in the public record.

On Monday, April 21, 2014, the day the parties would present opening statements and witnesses to the jury, the deputy court administrator called the case. The court then closed the courtroom to all except the attorneys, the defendant, and court staff. The court said: "We have just cleared the courtroom just for a quick moment from the spectator gallery." Defense counsel then stated: "Your Honor, this is a—I thought about the court's suggestion, and I would ask the court to reconsider." Defense counsel asked that the public be allowed to be present, including media, because "[t]o not allow that would infringe upon the freedom of the public to be present as well as the free press. [Smith] has that right to a public trial."

The district court proceeded to discuss the "pretrial ruling of the court" and advised the parties and Smith that the court had ruled to exclude some of the evidence of Brady's prior bad acts. As part of the ruling, the court explained that defense counsel could not "disclose the names of [J.K., C.K.] or Brady involved in prior burglaries before November 22, 2012." The court stated that the evidence was inadmissible because Smith did not know the identity of those who broke into his home before Thanksgiving. The court then explained its reasoning for closing the courtroom:

24

And for that reason—that was the reason that the court is not allowing the press in for this ruling, because otherwise it could be printed, and indeed, while the jurors hopefully will follow the admonition not to read or hear anything in the press and TV and such in the meantime while this case is pending, certainly the media would publish and print the substance of the court's pretrial ruling, and then of course it runs the risk of getting to the jury if for some reason they don't adhere to their oath.

Defense counsel then clarified whether he could call C.K. as a witness and asked: "Your Honor, if I—are we done with the record?" Counsel and the court had a discussion off the record. Then the courtroom was opened. The proceeding in the closed courtroom constituted four pages out of the 1899-page trial transcript.

Immediately after the closed proceeding, at 10:00 a.m., the judge filed a written order on the motion in limine heard on April 17 and then discussed briefly in the closed courtroom. The order, publicly available, ruled that evidence of prior bad acts by Brady or Kifer, of which Smith was not aware at the time of the shooting, would be inadmissible at trial. The order explained that "insofar as the [evidence that Smith was the victim of prior burglaries occurring before the shooting, that forcible entry was made, and that weapons were taken that were not recovered at the time of the shooting] may be received through the testimony of Deputy Luberts or other law enforcement agents, there will be no need to seek its admission through more prejudicial means (*i.e.*, through the testimony of Brady's mother or of a perpetrator of the prior break-ins)." The order did not name J.K. or C.K., the alleged co-perpetrators of the prior burglaries. At 10:03 a.m., the jury entered the courtroom to be sworn and to hear opening statements.

Smith argues that this closed proceeding violated his right to a public trial under the Sixth Amendment to the U.S. Constitution and its state counterpart, Article I, Section

25

6 of the Minnesota Constitution. "Whether the right to a public trial has been violated is a constitutional issue that we review de novo." *State v. Brown*, 815 N.W.2d 609, 616 (Minn. 2012). Although structural errors typically require automatic reversal, *State v. Everson*, 749 N.W.2d 340, 347 (Minn. 2008), the remedy for denying a defendant's right to a public trial "should be appropriate to the violation, and a retrial is not required if a remand will remedy the violation." *State v. Bobo*, 770 N.W.2d 129, 139 (Minn. 2009); *see Waller v. Georgia*, 467 U.S. 39, 46 (1984) (remanding a case for a public suppression hearing when the closure of the previous suppression hearing violated defendant's right to a public trial and holding that if the same evidence was not suppressed at the new hearing, there would be no new trial).

A.

"Both the U.S. and Minnesota Constitutions provide: 'In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial. . . .' " *State v. Benton*, 858 N.W.2d 535, 540 (Minn. 2015) (quoting U.S. Const. amend VI; Minn. Const. art. I, § 6). The right to a public trial is " 'for the benefit of the accused; that the public may see [the defendant] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and the importance of their functions.' " *State v. Lindsey*, 632 N.W.2d 652, 660 (Minn. 2001) (quoting *Waller*, 467 U.S. at 46).

" '[T]he public trial guarantee applies to all phases of trial.' " *Benton,* 858 N.W.2d at 540 (quoting *Brown*, 815 N.W.2d at 617). The phases of trial encompass preliminary hearings, *Benton*, 858 N.W.2d at 540; *Press-Enter. Co. v. Superior Court*,

26

478 U.S. 1, 10-13 (1986); voir dire, *Presley v. Georgia*, 558 U.S. 209, 213-14 (2010); witness testimony, *Bobo*, 770 N.W.2d at 139; *State v. Mahkuk*, 736 N.W.2d 675, 683-85 (Minn. 2007); *State v. Fageroos*, 531 N.W.2d 199, 201 (Minn. 1995); closing arguments, *State v. Silvernail*, 831 N.W.2d 594, 601 (Minn. 2013); jury instructions, *Brown*, 815 N.W.2d at 616-18; and returning of the verdict. In *Waller*, the United States Supreme Court held that the right to a public trial also applies to evidentiary suppression hearings conducted prior to the presentation of evidence to a jury. 467 U.S. at 43, 46-47.

When determining whether the district court's closure of the courtroom was proper, we have adopted the test the Supreme Court set forth in *Waller*, which provides:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Fageroos*, 531 N.W.2d at 201 (quoting *Waller*, 467 U.S. at 48).

Smith argues that an analysis of the four *Waller* factors demonstrates that his Sixth Amendment right was violated. However, "before we can apply the *Waller* test to determine if a closure is justified, we must determine whether a [Sixth Amendment] closure even occurred." *State v. Taylor*, 869 N.W.2d 1, 11 (Minn. 2015). We have previously recognized that "the right to a public trial is not an absolute right." *Fageroos*, 531 N.W.2d at 201. Some situations warrant restrictions on public access, *Taylor*, 869 N.W.2d at 10, and other courtroom restrictions do not implicate a defendant's right to a public trial. *Id.* at 11 (citing *Brown*, 815 N.W.2d at 617). In *Lindsey*, for example, we determined that some closures are " 'too trivial to amount to a violation of the [Sixth]

27

Amendment.' " 632 N.W.2d at 660-61 (alteration in original) (quoting *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996)). Other nonpublic proceedings simply may not implicate the Sixth Amendment right to a public trial, depending on the nature of the proceeding.

In *Waller*, the United States Supreme Court made clear that a suppression hearing is of comparable status to a trial. But courts have distinguished suppression hearings from other "administrative" proceedings that do not implicate the Sixth Amendment right to a public trial. Contrary to what the "administrative" label suggests, such proceedings are not limited to purely administrative procedures before the court, such as scheduling. Instead, courts have also treated routine evidentiary rulings and matters traditionally addressed during private bench conferences or conferences in chambers as routine administrative proceedings. *U.S. v. Norris*, 780 F.2d 1207, 1209-11 (5th Cir. 1986); *State v. Hicks*, 837 N.W.2d 51, 61 (Minn. App. 2013), *aff'd on other grounds*, 864 N.W.2d 153 (Minn. 2015). It is the type of proceeding, not the location of the proceeding, that is determinative. *See Everson*, 749 N.W.2d at 352 (explaining how the courtroom was transformed into the jury room by the judge's instructions); *Hicks*, 837 N.W.2d at 60-61 (determining that the district court held a "chambers conference" in the courtroom).

In administrative proceedings, "[n]on-public exchanges between counsel and the court on such technical legal issues and routine administrative problems do not hinder the objectives which the Court in *Waller* observed were fostered by public trials." *Norris*, 780 F.2d at 1210. In contrast to a suppression hearing, these administrative exchanges "ordinarily relate to the application of legal principles to admitted or assumed facts so

that no fact finding function is implicated. A routine evidentiary ruling is rarely determinative of the accused's guilt or innocence." *Id.* at 1210. Additionally, "such evidentiary rulings ordinarily pose no threat of judicial, prosecutorial, or public abuse that a public trial is designed to protect against." *Id.* at 1210-11.[6]

Thus, courts have allowed nonpublic proceedings for evidence-related proceedings such as: deciding whether a witness will testify under threat of contempt, *State v. Reed*, 352 P.3d 530, 534-35, 542 (Kan. 2015), *cert. denied*, ___ U.S. ___, 136 S. Ct. 344 (2015); determining the scope of witness immunity, *People v. Olivero*, 735 N.Y.S.2d 327, 328 (N.Y. App. Div. 2001); sidebar conferences on evidentiary rulings, *State v. Smith*; 334 P.3d 1049, 1052-55 (Wash. 2014); and consideration of offers of proof, *United States v. Vázquez-Botet*, 532 F.3d 37, 51-52 (1st Cir. 2008). We, too, have distinguished between the key phases of trial, on the one hand, and the concept of bench and chambers conferences, on the other. *Minneapolis Star & Tribune Co. v. Kammeyer*, 341 N.W.2d 550, 560 (Minn. 1983). We have held that bench and chambers conferences

---

[6]     The concurrence casts doubt on *Norris* by pointing to an earlier Fifth Circuit case, *Rovinsky v. McKaskle*, 722 F.2d 197 (5th Cir. 1984). In *Rovinsky*, the Fifth Circuit held that the defendant's Sixth Amendment right to a public trial was violated when the district court conducted private, in-camera hearings on a motion in limine during the course of the trial. *Id.* at 200-02. The prosecution's motion in limine sought to restrict defense counsel's cross-examination of prosecution witnesses. *Id.* at 199. But the facts in *Rovinsky* are distinguishable from this case. Here, the pretrial hearing on the motions in limine was open to the public and did not occur behind closed doors. Therefore, regardless of the similarity in the subject matter of the motion in this case and that in *Rovinsky*, *Rovinsky* does not substantially undermine the later *Norris* decision.

29

may occur, so long as a record is made and the record is available to the press and the public.[7] *Id.*

## B.

In this case, the district court's nonpublic proceeding was administrative in nature and did not constitute a closure implicating Smith's Sixth Amendment right to a public trial. The brief proceeding was an outgrowth of two previous public hearings, held on March 25 and April 17, on the subject of evidence of other burglaries. These hearings resulted in public orders dated April 4 and April 21.[8] The essence of the nonpublic proceeding was the court explaining the parameters of its April 21 written decision. This was an issue of evidentiary boundaries, similar to what would ordinarily and regularly be discussed in chambers or at a sidebar conference—on the record, but outside the hearing of the public. The discussion took only minutes, it was transcribed, and it consumed only

---

[7]     Justice Brennan's concurrence in *Richmond Newspapers, Inc. v. Virginia*, also drew a distinction between bench and chambers conferences, on the one hand, and trial proceedings, on the other hand. 448 U.S. 555, 598 n.23 (1980) (Brennan, J., concurring in judgment). We are unaware of any support (much less from the United States Supreme Court) for the concurrence's notion that sidebar conferences are "constitutionally distinct" from chambers conferences such that the public must be able to view the silent "conduct" of attorneys and the judge.

[8]     The district court's stated reason for closing the April 21 proceeding was to prevent further dissemination of the names of J.K. and C.K. Given that the names were in the public record as of April 17, we do not understand the district court's rationale for closing the proceeding to the public. But any error in doing so was not of constitutional magnitude.

two-tenths of one percent of the trial transcript. Smith received a public trial.[9] Thus, we hold that Smith's Sixth Amendment right was not violated.

IV.

Third, Smith argues that the district court erroneously excluded four pieces of evidence, thereby violating his constitutional right to present a complete defense. Smith points to the following evidentiary rulings: (1) the exclusion of witnesses who would have testified about the prior burglaries at Smith's house; (2) the exclusion of evidence of a shotgun taken from Smith's home in a prior burglary; (3) the exclusion of testimony from an expert witness, Glenn Negen, that Smith was suffering from critical-incident stress at the time of the second shooting; and (4) the exclusion of testimony linking Brady to a prior burglary at Smith's home. The State responds that the district court did not abuse its discretion, and even if it did, any error was harmless beyond a reasonable doubt because it would not have changed the verdict.

Due process requires that every defendant be " 'afforded a meaningful opportunity to present a complete defense.' " *State v. Richards*, 495 N.W.2d 187, 191 (Minn. 1992) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). "The defendant has the right 'to present the defendant's version of the facts through the testimony of witnesses.' " *State v. Munt*, 831 N.W.2d 569, 583 (Minn. 2013) (quoting *State v.*

---

[9] The concurrence discusses at length several issues relative to the public trial right that we need not decide today. Because the closed proceeding in this case was similar to a chambers or bench conference, there is no reason to go further and describe precisely when, as the concurrence puts it, a proceeding "resembles, and thereby possesses the characteristics of, a bench or jury trial." Nor is it necessary to decide whether the taking of testimony means that a proceeding has become "trial-like."

31

*Richardson*, 670 N.W.2d 267, 277 (Minn. 2003)). However, "both the accused and the state must comply with procedural and evidentiary rules designed to ensure 'both fairness and reliability in the ascertainment of guilt and innocence.' " *State v. Richardson*, 670 N.W.2d 267, 277 (Minn. 2003) (quoting *Richards*, 495 N.W.2d at 195).

"If a trial court's evidentiary ruling is determined to be erroneous, and the error reaches the level of a constitutional error, such as denying the defendant the right to present a defense, our standard of review is whether the exclusion of evidence was 'harmless beyond a reasonable doubt.' " *Richardson*, 670 N.W.2d at 277 (quoting *State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994)). Under this standard, we "must be satisfied beyond a reasonable doubt that if the evidence had been admitted and the damaging potential of the evidence fully realized, an average jury (*i.e.,* a reasonable jury) would have reached the same verdict." *State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994) (footnote omitted). "If, on the other hand, there is a reasonable possibility that the verdict might have been different if the evidence had been admitted, then the erroneous exclusion of the evidence is prejudicial." *Id.*

A.

The district court properly admitted evidence that Smith's house had been burglarized prior to Thanksgiving Day. But Smith argues that the district court abused its discretion when it excluded witnesses who would have testified in more detail about the prior burglaries. Smith sought to offer evidence of Brady's and Kifer's prior bad acts, especially witness testimony that Brady was involved in a previous burglary of Smith's home. As discussed above, the district court issued a written order that the evidence of

32

Brady's and Kifer's involvement was inadmissible at trial under Minn. R. Evid. 403, on the ground that the jury must judge the reasonableness of Smith's actions based on "his state of mind at the time of the shooting, not by what was learned after the event." As the district court explained, at the time of the shooting, no evidence suggested that Smith "knew who Nicholas Brady was, knew that it was Brady who had burglarized his home, or believed that it was Brady who had burglarized his home on a prior occasion or occasions." (Footnote omitted.) The court determined that the evidence concerning Brady's prior bad acts was "substantially outweighed by the danger of unfair prejudice; that it would entail a trial-within-a-trial; and that it would misdirect the jury away from the 'key inquiry' . . . 'the reasonableness of the use of force and the level of force under the specific circumstances of each case.' " (Citation omitted.)

Under Minn. R. Evid. 403, the district court has broad discretion in weighing probative value against unfair prejudice. *Doe 136 v. Liebsch*, 872 N.W.2d 875, 882 (Minn. 2015); *see State v. Schulz*, 691 N.W.2d 474, 477 (Minn. 2005). On this issue, the district court did not abuse that broad discretion.

In *State v. Penkaty*, we held that evidence of a victim's prior violent acts "is admissible to show that the defendant was reasonably put in apprehension of serious bodily harm, *provided that the defendant knew of the prior acts*." 708 N.W.2d 185, 202 (Minn. 2006) (emphasis added). *Penkaty*'s proviso applies here. Smith suspected that his neighbor, A.W., rather than Brady or Kifer, was committing the burglaries. The district court did not limit Smith from presenting evidence related to "the relevant facts of prior burglaries, including that they occurred, the form of entry into [his] property, if

33

known, and items taken." All of these factors went to Smith's state of mind at the time of the shooting and the reasonableness of his actions. But, particular information about Brady and Kifer that Smith did not then know was of limited, if any, probative value and posed a risk of unfair prejudice. Specifically, the jury could have become confused about what Smith knew at the time of the shooting, thereby giving Smith an "unfair advantage." Minn. R. Evid. 403; *see also Schulz*, 691 N.W.2d at 478.

## B.

Smith next argues that the district court improperly excluded evidence of a shotgun stolen from Smith's house before November 22. Two guns were stolen from Smith's house, but neither of the guns was used on Thanksgiving Day. The stolen shotgun was later recovered by law enforcement. Smith identifies error in two rulings regarding the shotgun. First, the district court excluded the shotgun itself and instead admitted a photograph of the gun and testimony describing it. Second, the district court prevented testimony from the deputy sheriff that the stolen gun, when recovered, was fully functional and was likely functional on Thanksgiving Day.

The district court did not abuse its broad discretion by excluding the shotgun. The district court reasonably determined that it was not necessary for the jury to see the gun itself to understand its deadly potential. A photograph of the shotgun was sufficient. The district court explained that "[i]t [was] not relevant to wave the gun around" when Smith's fear was not tied to a particular gun, but to the fact that "people who steal guns use guns." Although the district court did not cite a specific rule of evidence, it made a Rule 403 ruling. Minn. R. Evid. 403. The additional probative value of the jury seeing

34

the shotgun, as opposed to the photograph of the shotgun admitted into evidence, was minimal, and the defense lawyer displaying the shotgun in court could have been unfairly prejudicial.

The district court abused its discretion, however, in limiting the extent to which a witness, the deputy sheriff, was allowed to describe the shotgun to the jury. Defense counsel asked: "Do you have any reason to believe that [the] shotgun was not a fully-functioning firearm?" The State objected on relevance grounds, and the district court sustained the objection. Although the district court's reasoning is not in the record, the State argues that the functionality of the shotgun was irrelevant (or only marginally relevant) to Smith's fear that the guns stolen from his house could be used. Smith argues that the district court issued inconsistent rulings when it agreed that the two stolen guns "out there [that] could be used" were relevant, yet sustained the objection regarding the functionality of the shotgun.

Under Rule 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Evidence that is only " 'marginally relevant,' " however, may be excluded. *State v. Quick*, 659 N.W.2d 701, 713 (Minn. 2003) (quoting *Crane v. Kentucky*, 476 U.S. 683, 689 (1986)). Here, Smith was afraid that the burglars would use his stolen guns. Whether his stolen shotgun was functional went to the reasonableness of Smith's fear that the shotgun could be used against him. This evidence was of more than marginal relevance and should have been admitted.

35

The error, though, does not require reversal, as it was harmless beyond a reasonable doubt. A reasonable jury would have reached the same verdict had the district court admitted evidence that the shotgun was functioning and the potential damage of that evidence was fully realized. The jury heard considerable evidence that Smith was very afraid that his guns were in the hands of the burglars. There was no evidence presented that the stolen guns were not functional. The jury also had the opportunity to consider the audio recordings of the shooting, Smith's statements to law enforcement, and all of the other evidence presented at trial. We therefore hold that the erroneous exclusion of the evidence about the shotgun's functionality was not prejudicial.

C.

Smith also argues that the district court abused its discretion when it excluded the testimony of Glenn Negen, an expert who would have testified that Smith suffered from "critical-incident stress," which impaired his ability to hear the events leading up to the second shooting. For instance, Negen would have testified that Smith did not hear Kifer when she entered the residence and that Smith may have been surprised when she came down the stairs. The district court ruled from the bench (and later by written order) that Negen would not be allowed to testify about the audio-visual impairment caused by critical-incident stress.

Assuming without deciding that the district court abused its discretion, the exclusion of Negen's expert testimony was harmless beyond a reasonable doubt. A reasonable jury, even after hearing the expected testimony, would have reached the same verdict. As the district court determined, the expert's proffered testimony that Smith's

36

hearing was impaired was "contradicted by evidence tending to show that [Smith] did hear Kifer before she descended the stairs." Smith's statements to law enforcement after the shooting demonstrated his ability to hear. The jury also would have likely discounted Negen's testimony on critical-incident stress using other evidence in the record, including the fact that at least 10 minutes passed between the end of the Brady shooting and the beginning of the Kifer shooting. Thus, we conclude that the error, if any, in excluding the expert testimony was harmless beyond a reasonable doubt.

D.

Fourth, Smith alleges that the district court erred when it excluded evidence of who might have kicked in the basement door panel during the October 27 burglary. The evidence showed a connection between the tread pattern on the door panel and the shoes Brady was wearing when Smith shot him. Smith argues that the evidence goes to his state of mind when he saw Brady and then Kifer descending the stairway, because he told investigators on November 23 that he saw Brady's feet first, shot him, and then put the shoes to the side.

We conclude that the district court did not abuse its discretion in excluding the tread-pattern evidence linking Brady to the October 27 burglary. The district court reasonably determined that, at the time of the shooting, Smith had no accurate knowledge of precisely who committed the previous burglaries. Smith repeatedly told the police that he suspected his neighbor, A.W., was responsible for the burglaries and that he thought the woman he killed was A.W. Although Smith set Brady's shoes to the side before shooting Kifer, Smith told investigators that he connected Brady's shoes to the previous

37

burglary only *after* he shot Kifer and checked her shoes.  The tread pattern on Brady's shoes was of no relevance to Smith's assertion that he acted in defense of person or property.

V.

Next, we address whether the prosecutor committed misconduct in his closing argument, and if so, whether the district court plainly erred when it failed to issue a cautionary instruction to the jury.  Smith argues that the prosecutor committed misconduct by asking the jury members to consider whether they heard Kifer say "I'm sorry" on the audio recording between the third and fourth shots.  Smith alleges that the prosecutor disregarded the court's original ruling, which changed the words "I'm sorry" in the recording transcript to "unclear."  Smith further contends that the district court erred when it failed to give a promised curative instruction after ruling the prosecutor's conduct was prejudicial.[10]  The State argues that the prosecutor did not commit misconduct because the content of the recording was debatable, and even if the prosecutor's remark constituted misconduct, it was harmless beyond a reasonable doubt.

Determining whether the district court erred on an issue of prosecutorial misconduct is a two-step analysis.  We first address whether there was misconduct, and second, consider whether that misconduct entitles the defendant to a new trial.  *State v. Wren*, 738 N.W.2d 378, 390 (Minn. 2007).

---

[10]     Smith objected to the prosecutor referencing the statement "I'm sorry" in closing argument and moved for a mistrial.  The district court denied Smith's request for a mistrial, but stated a cautionary instruction was required.  None was given.  Because Smith did not object to the lack of a curative instruction, we review for plain error.

A.

In determining whether misconduct occurred, we look at whether the prosecutor's acts "have the effect of materially undermining the fairness of a trial." *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007). "A prosecutor engages in prosecutorial misconduct when [the prosecutor] violates 'clear or established standards of conduct, e.g., rules, laws, orders by a district court, or clear commands in this state's case law.' " *State v. McCray*, 753 N.W.2d 746, 751 (Minn. 2008) (quoting *Fields,* 730 N.W.2d at 782). When evaluating " 'prosecutorial misconduct during a closing argument, we look to the closing argument as a whole, rather than to selected phrases and remarks.' " *Id.* (quoting *Ture v. State*, 681 N.W.2d 9, 19 (Minn. 2004)). Prosecutors are allowed to " 'argue all reasonable inferences from evidence in the record. It is unprofessional conduct[, however,] for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.' " *Bobo*, 770 N.W.2d at 142 (quoting *State v. Salitros*, 499 N.W.2d 815, 820 (Minn. 1993)); *see McCray*, 753 N.W.2d at 753-54; *State v. Wahlberg*, 296 N.W.2d 408, 419-20 (Minn. 1980).

B.

Here, the prosecutor's statement—a question for the jury to consider—did not constitute misconduct, and therefore the district court did not err in failing to issue a curative instruction. The prosecutor did no more than argue an inference from the evidence. Listeners can reasonably disagree on the words or sounds that Kifer uttered between the third and fourth shots. That issue was for the jury, and the prosecutor's reference, which allowed the jury to consider it, did not rise to the level of misconduct.

Smith's argument that the prosecutor violated the court's previous ruling is also without merit. Smith is correct that the district court, upon listening to the recording, stated that the female voice did not say "I'm sorry" and that the words "I'm sorry" should be replaced with the word "unclear" in the transcript of the audio recording unless counsel could agree on what was said. In its later ruling from the bench, however, the district court clarified that its original statement was not meant to decide affirmatively what Kifer said because the sounds were ambiguous. The court's comments suggested that the sounds were subject to debate. Both sides were free to argue their reasonable interpretations to the jury.

VI.

Finally, we address whether the district court erred by allowing Smith to challenge the restitution request for the estimated headstone expenses. The State argues that Smith waived his right to challenge the restitution for the headstones under Minn. Stat. § 611A.045, subd. 3(a) (2014) because: (1) his affidavit was untimely; and (2) he failed to meet his burden of production. Smith counters that the State failed to preserve both arguments for appeal.

A.

Smith's argument that the State forfeited its timeliness and pleading arguments fails. "A reviewing court must generally consider 'only those issues that the record shows were presented and considered by the trial court in deciding the matter before it.' " *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (quoting *Thayer v. Am. Fin. Advisers, Inc.*, 322 N.W.2d 599, 604 (Minn. 1982)). In the district court, the State argued in its

memorandum of law in support of the families' request for restitution that the only issue before the court was whether the Brady family's claim for restitution could be offset by the losses Smith incurred from the previous burglaries. The State's argument was based on its assertion that Smith did not meet his burden of production under Minn. Stat. § 611A.045, subd. 3(a). In its memorandum of law to the district court, the State explained that Smith's service was untimely and that he did not specifically challenge the restitution request for the headstones in his affidavit. (The State had not received Smith's affidavit at the time it filed the memorandum.) In response, the district court issued an order determining that Smith timely filed the affidavit within five days of the hearing. Thus, the State preserved this issue for appeal.

B.

We now turn to whether Smith waived his right to challenge the restitution for the headstones under Minn. Stat. § 611A.045, subd. 3(a). "Statutory interpretation presents a question of law, which we review de novo." *State v. Riggs*, 865 N.W.2d 679, 682 (Minn. 2015). Our objective when engaging "in statutory interpretation is to 'effectuate the intent of the legislature.'" *Id.* (quoting *State v. Jones*, 848 N.W.2d 528, 535 (Minn. 2014)); *see also* Minn. Stat. § 645.16 (2014). We first look to a statute's plain and unambiguous language to discern the Legislature's intent. *Riggs*, 865 N.W.2d at 682.

Under Minn. Stat. § 611A.045, subd. 3(a), the offender bears the initial burden of production to challenge a restitution request. The timing of that burden is plain and unambiguous:

[T]he offender shall have the burden to produce evidence if the offender intends to challenge the amount of restitution or specific items of restitution or their dollar amounts. This burden of production must include a detailed sworn affidavit of the offender setting forth all challenges to the restitution or items of restitution, and specifying all reasons justifying dollar amounts of restitution which differ from the amounts requested by the victim or victims. *The affidavit must be served on the prosecuting attorney and the court at least five business days before the hearing*.

*Id.* (emphasis added).

Applying the plain words of the statute, the district court erred when it determined that Smith's affidavit was timely. Smith should have served the State and the court with his restitution affidavit at least 5 business days before the hearing. He did not. The restitution hearing was set for Tuesday, August 26, 2014. The phrase "business days" excludes the weekend. Smith therefore needed to serve the State with his affidavit on or before Tuesday, August 19. The affidavit of service shows that Smith served the State via U.S. mail on August 20, one day late, and the district court received Smith's affidavit on August 21, two days late. Therefore, Smith failed to timely contest the headstone restitution request. Accordingly, we reverse the district court on this issue and order the court to award $10,049.46 in restitution for Brady's headstone and $9,400.16 for Kifer's headstone.

Because Smith's affidavit was untimely, we need not address whether Smith failed to meet his burden of production under Minn. Stat. § 611A.045, subd. 3(a), or whether restitution is allowed for anticipated future expenses.

42

## VII.

For the foregoing reasons, we affirm Smith's first-degree murder convictions and reverse the district court's denial of restitution for the victims' headstones.

Affirmed in part and reversed in part.


HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

CONCURRENCE

STRAS, Justice (concurring).

"In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI; *see also* Minn. Const. art. I, § 6. This command, found in the Sixth Amendment to the United States Constitution and Article I, Section 6 of the Minnesota Constitution, protects an accused by making criminal trials open to public view. Giving access to the public ensures that the accused is "fairly dealt with and not unjustly condemned" and keeps the " 'triers keenly alive to a sense of their responsibility and to the importance of their functions.' " *In re Oliver*, 333 U.S. 257, 270 n.25 (1948) (quoting 1 Thomas M. Cooley, *Constitutional Limitations* 647 (8th ed. 1927)). The trial in this high-profile case, which captured the attention of Minnesotans because of its unusual facts and the deaths of two teenagers, is precisely the type of trial for which the protection of the Sixth Amendment is most critical. *See id.* at 268-71 (discussing the origins of the public-trial right).

In this case, no one disputes that the district court cleared the gallery of all spectators and physically closed the courtroom before having a discussion with counsel from both sides about the scope of an evidentiary ruling. The evidentiary ruling prohibited Smith from having certain witnesses testify that one of the victims had previously burglarized his home. The district court's reason for the closure—to keep the media from printing the identity of the witnesses and the content of their potential testimony—was plainly unacceptable in light of the purposes underlying the Sixth Amendment public-trial right and the press's First Amendment right of access to the

courts. *See id.*; *see also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603-06 (1982) (explaining the relationship between the Sixth Amendment public-trial right and the First Amendment right of access to criminal trials). Nevertheless, I reach the same conclusion as the court: the closure in this case did not violate the Sixth Amendment. I do so not because I view the closure as trivial or administrative, as the court does,[1] but because I am unconvinced that the closure here occurred during Smith's "trial." U.S. Const. amend. VI; Minn. Const. art. I, § 6. Therefore, I concur only in the judgment with respect to Part III of the court's opinion.[2]

I.

This case involves the prosecution of Byron David Smith for the shootings of Nicholas Brady and Haile Kifer, two teenagers shot by Smith during a burglary of his home. A major theory of Smith's defense was that, in shooting Brady and Kifer, he was acting to defend his home against burglars whom he believed might be armed and dangerous. The district court allowed Smith to present evidence of the previous

---

[1]    To be sure, this court has used the term "trivial" to describe those closures that do not implicate a criminal defendant's Sixth Amendment public-trial right. *See, e.g.*, *State v. Silvernail*, 831 N.W.2d 594, 600-01 (Minn. 2013); *State v. Brown*, 815 N.W.2d 609, 617-18 (Minn. 2012); *State v. Lindsey*, 632 N.W.2d 652, 660-61 (Minn. 2001). Yet I remain unpersuaded that any of these cases actually involved courtroom closures. *See United States v. Thompson*, 713 F.3d 388, 394-95 (8th Cir. 2013) (describing the differences between complete and partial closures of a courtroom). In each of them, the district court never cleared the gallery of all spectators; members of the press or public were always present; and the defendant, his family, his friends, and witnesses were never improperly excluded. *See Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966) (stating that the "courtroom and courthouse premises are subject to the control of the court").

[2]    I join the remainder of the court's opinion.

burglaries of his home and evidence that the burglars had stolen a shotgun during one of those burglaries. However, the parties disagreed about whether Smith could present evidence that Brady, one of the two victims, was involved in the burglaries. Smith sought to introduce evidence of Brady's participation through three witnesses: Brady's mother and two of Brady's friends, C.K. and J.K., both of whom allegedly had been involved in previous burglaries with Brady.

The district court considered arguments on that issue on Thursday, April 17, 2014, during a hearing in open court. Smith's counsel argued that he should be able to present evidence of Brady's participation in the burglaries through the testimony of Brady's alleged co-participants, C.K. and J.K., whom he identified by name. When the court next convened, on the morning of Monday, April 21, 2014, the judge "cleared the courtroom," including "the spectator gallery," which resulted in only the defendant, the attorneys, and court staff being present in the courtroom. Defense counsel objected to the closure, but the district court overruled the objection. The court then explained that it would not allow Smith to present testimony about Brady's prior bad acts, or the involvement of J.K. or C.K. in the prior burglaries, because Smith did not know who had previously burglarized his home. The court then explained its reason for clearing the courtroom:

> [T]he court is not allowing the press in for this ruling, because otherwise it could be printed, and indeed, while the jurors hopefully will follow the admonition not to read or hear anything in the press and TV and such in the meantime while this case is pending, certainly the media would publish and print the substance of the court's pretrial ruling, and then of course it runs the risk of getting to the jury if for some reason they don't adhere to their oath.

C-3

After further clarifying the scope of its ruling and permitting the parties to have a brief off-the-record conversation, the district court reopened the courtroom. The jury entered a short time later, at 10:03 a.m.

Essentially simultaneously, at 10:00 a.m., the court filed a written order, which the court made available to the public, ruling that Smith would be allowed to present evidence of the previous burglaries only through the testimony of law-enforcement officers, not "through more prejudicial means (*i.e.*, through the testimony of Brady's mother or of a perpetrator of the prior break-ins)." The order did not identify J.K. or C.K., and therefore provided less information to the public than would have otherwise been available had the courtroom been open that morning.

## II.

The public-trial right, guaranteed by the Sixth Amendment to the United States Constitution, has an "obscure" historical pedigree. *In re Oliver*, 333 U.S. 257, 266 (1948). The right has its roots in the English common law, *see id.*, and it first appeared in the Pennsylvania and North Carolina Constitutions in 1776, *see* Pa. Const., Declaration of Rights IX (1776); N.C. Const., Declaration of Rights IX (1776). Since then, nearly every state has adopted a rule, typically one of constitutional weight, requiring criminal trials to be open to the public. *See Oliver*, 333 U.S. at 267-68; *see also* 21A Am. Jur. 2d *Criminal Law* § 967 (2016) (collecting cases). Generally, no phase of a criminal trial is exempt from the public-trial guarantee. *State v. Benton*, 858 N.W.2d 535, 540 (Minn. 2015) (citing *State v. Brown*, 815 N.W.2d 609, 617 (Minn. 2012)); *see also Richmond*

*Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564 (1980) (plurality opinion) ("[T]hroughout its evolution, the trial has been open to all who care to observe.").

In addition to its English common-law heritage, the public-trial right was in part a response to certain historical practices. Specifically, a "distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet." *Oliver*, 333 U.S. at 268-69 (footnotes omitted). These controversial practices, which permitted a summary determination of guilt (lettres de cachet) or entailed conducting some criminal proceedings in secret (Star Chamber), were discontinued based on their unpopularity. *See id.* at 268-69, nn.21-23. The Star Chamber, for example, was in tension with the common law tradition of open criminal trials that began before the Norman Conquest. *See Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 505 (1984). The Bill of Rights, including the Sixth Amendment, "was enacted against th[is] [historical] backdrop." *Richmond Newspapers*, 448 U.S. at 575 (plurality opinion). The public-trial right became "a safeguard against any attempt to employ [the] courts as instruments of persecution." *Oliver*, 333 U.S. at 270. Yet despite the basic command in the Sixth Amendment that criminal trials are to be open to the public, courts have long disagreed about the scope of the public-trial right and to what types of legal proceedings the right attaches. *See United States v. Kobli*, 172 F.2d 919, 922 (3rd Cir. 1949) (describing the discord among courts as to the scope of the Sixth Amendment's public-trial guarantee).

A.

What is not reasonably subject to debate is that the district court's reasons for closing the courtroom in this case conflict with the history and rationale of the public-trial right. The court closed the courtroom because of its concern that, due to the high-profile nature of the case, "the media would publish and print the substance of the court's pretrial ruling." To be fair, the court's concern was not motivated by hostility to the media, but rather by the possibility, hypothetical at that point, that jurors would not "adhere to their oath" and would read press accounts of the pretrial proceedings, including the substance of the court's pretrial ruling to exclude certain testimony.

Such hypothetical and speculative concerns, however, do not justify the closure of a trial. The "right to a . . . public trial" is listed first (along with the speedy-trial right) among a whole series of trial rights that accrue to criminal defendants. This placement, as well as its history, suggests that the public-trial right is a structural protection, like the impartial-jury requirement, that safeguards the other rights enumerated in the Sixth Amendment, including the rights to counsel, to confront one's accusers, and to compulsory process. *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 896 (1991) (Scalia, J., concurring in part) (noting that the public-trial right "provide[s] benefits to society" that resemble structural guarantees). As the Supreme Court of the United States has stated,

> [t]he requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.

*Waller v. Georgia*, 467 U.S. 39, 46 (1982) (quoting *Oliver*, 333 U.S. at 270 n.25).

Moreover, as the Supreme Court recognized in creating a corollary right of access to the press under the First Amendment, open criminal trials play an important role in ensuring confidence in government:

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

*Press-Enter.*, 464 U.S. at 508. The media's access to the trial is essential to achieving these objectives. The media often "function[] as surrogates for the public," *Richmond Newspapers*, 448 U.S. at 573, serving as conduits for the dissemination of information " 'to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.' " *Id.* at 592-93 (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975)). In short, the public cannot serve as a check on abuses of justice if the trial is conducted behind closed doors.

Thus, three flaws underpin the district court's reasoning. First, the concern that the press might publish an account of a proceeding should weigh in favor of keeping the courtroom doors open, not against it, because press coverage serves the important structural safeguard of opening the judicial process to public inspection. This is especially true when the concern motivating the closure—having the jurors learn the identity of witnesses who would be favorable to Smith's claim of self-defense and the content of their potential testimony—was not a threat to Smith's right to a fair trial. *See*

C-7

*Waller*, 467 U.S. at 45 (stating that the right to "an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information").

Second, the court's reasoning applies to *every* instance in which a court elects to conduct proceedings outside of the hearing of the jury: if the press and the public are present for such proceedings, then there is always the possibility that the information might somehow reach the jury. But such a hypothetical possibility cannot justify closing the courtroom. *Cf. Minneapolis Star & Tribune Co. v. Kammeyer*, 341 N.W.2d 550, 557-58 (Minn. 1983) (discussing the constitutional prerequisites to closure of pretrial hearings based on a concern that the defendant will be prejudiced). Indeed, the Minnesota Rules of Criminal Procedure provide alternatives to closure that minimize the risk that potentially prejudicial information will reach the jury. Such alternatives include, among others, sequestering the jury, Minn. R. Crim. P. 26.03, subd. 5; admonishing the jurors not to "read, listen to, or watch news reports about the case," *id.*, subd. 9; and questioning each juror if potentially prejudicial material is "disseminated outside the trial proceedings," *id.*, subd. 10. Yet aside from providing a general admonishment to jurors warning them not to read press accounts or watch coverage of the trial, the district court did not explore any of these alternatives, at least not on the record. Instead, the court just decided to exclude the press and the public, without making any findings supporting the closure. *See Waller*, 467 U.S. at 48 (requiring a district court to make certain findings before closing the courtroom); Minn. R. Crim. P. 26.03, subd. 6(5) (requiring a district court to issue a written "order and supporting findings of fact" when making a decision to

restrict "public access" to "portions of the trial conducted outside the presence of the jury").

Third, the procedure selected by the court—closure of the courtroom—was unlikely to achieve its desired effect. The district court was concerned that its ruling, and the identity of the witnesses subject to the ruling, would reach jurors, but the court's April 21, 2015 order, which denied Smith's request to have Brady's mother and two other witnesses testify about Brady's role in prior burglaries, was available to the media. Any member of the media who attended the open hearing on April 17, 2015, when the court heard arguments from counsel and considered the potential testimony of these witnesses, would have been able to piece together the subject and scope of the court's evidentiary ruling and publish a story about it. Accordingly, the closure had the effect of depriving the proceedings of at least some of their appearance of legitimacy for only the most marginal of benefits to the objective of maintaining an impartial jury.

I do not mean to suggest that a district court can never close a courtroom during a criminal trial, regardless of the interests involved. Clearly, there are instances in which closure of the courtroom is not only acceptable, but may be required. *See Waller*, 467 U.S. at 45. However, for any closure during a trial to meet constitutional requirements:

> [1] [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.

*Id.* at 48.

If we were to apply the *Waller* factors to the courtroom closure in this case, there is little doubt that the closure would fail them. Even if the hypothetical possibility that jurors would learn about Brady's prior burglary attempts was an "overriding interest that [was] likely to be prejudiced"—itself a dubious conclusion—there is no question that the district court failed to consider "reasonable alternatives to closing the proceeding" or to "make findings adequate to support the closure." *Id.* Accordingly, whether the closure in this case violates the public-trial right depends on whether the closure occurred during "trial," which is the proceeding to which the right attaches. *See* U.S. Const. amend. VI (granting "the accused . . . the right to a speedy and public trial"); *see also Presley v. Georgia*, 558 U.S. 209, 212 (2010) (asking whether the right to a public trial "extends" to jury selection); *id.* at 217-18 (Thomas, J., dissenting) (framing the question as whether jury voir dire was covered by the "Sixth Amendment's '[P]ublic [T]rial' Clause" (alteration in original)).

B.

The most analytically difficult question in this case is whether the district court's explanation of a pretrial evidentiary ruling constitutes a part of the "trial" to which the public-trial right attaches. In discussing the First Amendment right of access to the courts, we have noted that, "at common law, there was no tradition of public access to pretrial proceedings." *Kammeyer*, 341 N.W.2d at 555. Similarly, the United States Court of Appeals for the Fifth Circuit has rejected the application of the public-trial right to discussions of pretrial evidentiary rulings, reasoning that a "routine evidentiary ruling is rarely determinative of the accused's guilt or innocence" and that such discussions

"ordinarily pose no threat of judicial, prosecutorial or public abuse." *See United States v. Norris*, 780 F.2d 1207, 1210 (5th Cir. 1986). The *Norris* approach, which does not extend the Sixth Amendment public-trial right to discussions of routine evidentiary matters and other administrative tasks, appears to be the majority rule. *See, e.g.*, *United States v. Valenti*, 987 F.2d 708, 714 (11th Cir. 1993); *United States v. Gurney*, 558 F.2d 1202, 1210 (5th Cir. 1977); *State v. Reed*, 352 P.3d 530, 540-42 (Kan. 2015); *State v. Smith*, 334 P.3d 1049, 1052-55 (Wash. 2014). I am less confident than the court, however, that *Norris* and these other cases draw the constitutional line in the right place.[3]

My doubt is rooted in the Supreme Court's decision in *Waller v. Georgia*, which predated *Norris* by 2 years. 467 U.S. 39 (1984). In *Waller*, the Court considered whether the Sixth Amendment required a courtroom to be open during a 7-day pretrial suppression hearing in which the legality and admissibility of wiretap recordings were at issue. *See id.* at 41-42. The trial court had closed the hearing because of the potential application of a Georgia law that rendered wiretap recordings inadmissible if they were published for any purpose other than a " 'necessary and essential' " one. *See id.* (quoting Ga. Code Ann. § 16-11-64(b)(8) (1982)). After the trial, the transcript of the closed hearing was released to the public. *See id.* at 43.

---

[3]     *Norris*, the principal case relied upon by the court, may not extend quite as far as the court suggests. Just 2 years earlier, the United States Court of Appeals for the Fifth Circuit decided *Rovinsky v. McKaskle*, in which it concluded that a trial court violated a criminal defendant's Sixth Amendment right to a public trial when it decided to conduct closed proceedings on a motion in limine seeking to restrict defense counsel's cross-examination of prosecution witnesses. 722 F.2d 197, 200-02 (5th Cir. 1984). The subject matter of the motion in this case closely resembles the motion from *Rovinsky*.

The Supreme Court unanimously held that the public-trial right extended to the pretrial suppression hearing in *Waller*. *See id.* at 47. It reasoned that the "aims and interests" underlying the public-trial right "are no less pressing in a hearing to suppress wrongfully seized evidence" and that "suppression hearings often are as important as the trial itself." *Id.* at 46. In reaching its decision, the Court focused on the fact that "a suppression hearing often resembles a bench trial: witnesses are sworn and testify[,] . . . [and] [t]he outcome frequently depends on a resolution of factual matters."[4] *Id.* at 47.

One of the lessons from *Waller* is that a closure is less likely to be constitutionally acceptable when a hearing involves live witness testimony, which is one of the reasons that I cannot join Part III of the Court's opinion. I understand the court to be holding—categorically, in fact—that a district court may close the courtroom during administrative proceedings and when making routine evidentiary rulings, whether in a bench conference or in another setting, without violating the Sixth Amendment.

---

[4] The Supreme Court's examination of whether the pretrial suppression hearing in *Waller* "resemble[d] a bench trial," as well as its holding in that case, suggest that the inquiry under the Sixth Amendment is functional rather than formal. A formal approach would consist of determining only whether a particular proceeding *is*, in fact, part of the "trial." A functional approach, by contrast, is flexible: the focus is on whether a particular proceeding is the *functional equivalent* of a trial. *Cf. N.L.R.B. v. Noel Canning*, ___ U.S. ___, ___, 134 S. Ct. 2550, 2563 (2014) (adopting a functional definition of the word "recess" in the Recess Appointments Clause of the United States Constitution). *Waller*'s approach of comparing and contrasting the characteristics of pretrial suppression hearings and trials is indicative of a functional approach to questions regarding the scope of the public-trial right.

In my view, however, the court's rule focuses on the wrong question. The question is not whether the task is administrative or legal, as the court seems to suggest. Rather, the relevant question is whether a criminal proceeding resembles, and thereby possesses the characteristics of, a bench or jury trial. *See United States v. Thompson*, 713 F.3d 388, 393 (8th Cir. 2013) (concluding that the public-trial right applies to sentencing hearings, largely because they are "trial like" proceedings). When a criminal proceeding involves the presentation of witness testimony, the arguments of counsel on a disputed question, or invocation of the court's fact-finding function, it is more likely to be subject to the requirements of the Sixth Amendment, whether or not it involves what appears to be an administrative task or a routine evidentiary motion.[5] *See, e.g.*, *Rovinsky v. McKaskle*, 722 F.2d 197, 200-02 (5th Cir. 1984) (extending the Sixth Amendment's public-trial right to a hearing on motions in limine); *Commonwealth v. Jones*, 37 N.E.3d 589, 603-08 (Mass. 2015) (extending the Sixth Amendment public-trial right to hearings on the application of Massachusetts' rape-shield law).

In this case, because all of the trial-like aspects of the proceedings—specifically, the consideration of witness testimony and the arguments of counsel—occurred during a

---

[5]  Sidebar conferences during trial, which the court conducts outside the earshot of the jury, are constitutionally distinct from the types of proceedings at issue here. In contrast to chambers conferences or closed evidentiary hearings, sidebar conferences permit members of the public to view the conduct of the attorneys and the judge, even if members of the gallery cannot hear what the attorneys and the judge are saying. *See People v. Virgil*, 253 P.3d 553, 578 (Cal. 2011) (noting that it cannot find any cases holding that "sidebar conferences" during trial "are akin to a closure of the courtroom"). In such a situation, the trial itself remains open and public, which is all that the Sixth Amendment requires.

hearing in open court on April 17, 2014, I would conclude that Smith's right to a public trial was not violated. Aside from discussing the scope of the court's written order, nothing else occurred during the brief hearing on the morning of April 21, 2014 that resembled a bench or jury trial. Accordingly, although the district court should not have closed the courtroom on the morning of April 21, *see* Minn. R. Crim. P. 26.03, subd. 6 (creating rules for "closed hearing[s]"), I cannot conclude under these facts that the closure violated Smith's rights under either the Sixth Amendment to the United States Constitution or Article I, Section 6 of the Minnesota Constitution.