# SUPREME COURT OF THE UNITED STATES

## BYRON DAVID SMITH *v.* JEFF TITUS, WARDEN

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 20–633.   Decided March 22, 2021

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, dissenting from denial of certiorari.

Because "the Sixth Amendment right to a public trial extends beyond the actual proof at trial," courts must meet a high standard "before excluding the public from any stage of a criminal trial." *Presley* v. *Georgia*, 558 U. S. 209, 212–213 (2010) (*per curiam*). At Byron Smith's trial, however, the judge cleared all members of the public from the courtroom before issuing a key evidentiary ruling. Even though the judge did not justify the closure in accordance with the dictates of this Court's precedents, the Minnesota Supreme Court found no constitutional error because it concluded that defendants have no public-trial right in so-called administrative proceedings. That ruling was manifestly incorrect. Because the Minnesota Supreme Court's decision contravened clearly established federal law, the Court of Appeals for the Eighth Circuit erred in denying Smith's application for a writ of habeas corpus. I would grant the petition for a writ of certiorari and summarily reverse.[1]

I

In the fall of 2012, Smith was the victim of a series of unsolved burglaries, including one that resulted in the theft of two firearms from his home. On Thanksgiving Day, two people again broke into Smith's house. Smith shot them multiple times at close range, killing them both. Although

―――――――

[1] Absent summary reversal, the Court should, at the very least, grant certiorari to determine whether the Eighth Circuit's decision can be reconciled with this Court's precedents. If nothing else, Smith's petition makes clear that state and federal courts are in need of further guidance.

Smith apparently did not know it at the time, one of the intruders, Nicholas Brady, may have participated in the earlier burglaries.

A Minnesota grand jury indicted Smith on two counts of first-degree premeditated murder. The case was scheduled for trial, where Smith planned to argue that he used reasonable force in defending himself. During pretrial proceedings, the court ruled that evidence of Brady's involvement in the prior burglaries would be inadmissible at trial. The court reasoned that because Smith did not know or suspect that Brady had ever burglarized his home, that fact was not relevant to Smith's "state of mind at the time of the shooting." Electronic Case Filing in *Smith* v. *Smith*, No. 0:17–cv–00673 (D Minn.), Doc. 2–1, pp. 2, 7 (ECF).

The issue came up again at a pretrial hearing on the parties' motions *in limine*, when Smith proposed to call two witnesses, Jesse Kriesel and Cody Kasper, to testify that they were Brady's accomplices in the prior burglaries.[2] On the first day of Smith's trial, immediately after the deputy court administrator called the case (and before the jury was seated), the court ruled on the admissibility of Kriesel's and Kasper's testimony. Before issuing its ruling, however, the trial judge cleared the courtroom of all public spectators, leaving only the attorneys, court staff, and Smith. See ECF Doc. 12–4, p. 4, Tr. 749. Smith's attorney objected to the courtroom closure, but the court overruled him. See *ibid.* The court then gave its reasons for precluding the witnesses' testimony:

> "[T]he pretrial ruling of the court was that the defense had given notice that it . . . wants to offer testimony from Jesse Kriesel and Cody Kasper about their involvement in prior burglaries which, of course, would have involved Nick Brady as well as a co-perpetrator.

---

[2] Smith also argued that he should be permitted to call Brady's mother to testify about Brady's involvement in the prior burglaries.

> And the court has ruled the defendant will not disclose the names of Kriesel, Kasper or Brady involved in prior burglaries . . . . Disclosure can be made of the relevant facts of prior burglaries, including that they occurred . . . and items taken[, but t]he limitation is in effect because . . . the court . . . finds that the defendant did not know . . . the identity of those who had broken into his home on prior occasions; and, therefore, it would be prejudicial." *Id.*, at 4–5, Tr. 749–750.

The court went on to explain why it had overruled defense counsel's objection to the courtroom closure:

> "And for that reason . . . the court is not allowing the press in for this ruling, because otherwise it could be printed, . . . and then of course it runs the risk of getting to the jury if for some reason they don't adhere to their oath." *Id.*, at 6, Tr. 751.

Smith's attorney requested clarification, asking whether Smith could "call Cody Kasper as a witness and ask [him] about his involvement . . . in these burglaries and who he was with and what he saw." *Ibid.* The court responded: "[A]t this point, no, Cody Kasper would not be testifying to that." *Id.,* at 7, Tr. 752.

Immediately after making its oral ruling from the bench, the trial court posted a written order on the public docket that "reiterate[d] that evidence of prior bad acts by Nicholas Brady . . . , of which [Smith] was unaware at the time of the shooting, shall be inadmissible at trial." ECF Doc. 2–2, p. 1. Because Smith could present evidence that he was the victim of prior burglaries "through the testimony of . . . law enforcement agents," the court found "no need to seek its admission through more prejudicial means (*i.e.,* through the testimony of . . . a perpetrator of the prior break-ins)." *Id.,* at 3. The public order did not mention Kriesel or Kasper by name, nor did it explain that Smith had sought to present their testimony specifically.

The remainder of the trial was open to the public. The jury found Smith guilty of two counts of first-degree murder. The court sentenced him to life without the possibility of release.

On appeal, Smith argued that the court violated his public-trial right when it closed the courtroom to rule on the admissibility of Kriesel's and Kasper's testimony. The Minnesota Supreme Court rejected that argument on the theory that "'administrative' proceedings," including "routine evidentiary rulings," categorically "do not implicate the Sixth Amendment right to a public trial." *State* v. *Smith*, 876 N. W. 2d 310, 329 (2016). The court explained that the trial court's ruling "was administrative in nature" because the discussion covered "an issue of evidentiary boundaries, similar to what would ordinarily and regularly be discussed in chambers or at a sidebar conference." *Id.,* at 330. The court affirmed Smith's convictions. *Id.,* at 336.

Smith applied for a writ of habeas corpus in federal court, but the District Court denied relief,[3] and the Eighth Circuit affirmed. The Eighth Circuit concluded that the Minnesota Supreme Court's decision did not contravene clearly established federal law because this Court has never specifically "addressed whether . . . 'administrative' proceedings . . . implicate the Sixth Amendment right to a public trial." 958 F. 3d 687, 692 (2020). It further determined that the Minnesota Supreme Court did not "unreasonably apply" this Court's precedents, concluding that "[i]t was not objectively unreasonable" to allow the trial court "to explain the parameters of an earlier public order on evidentiary issues in

---

[3] Although the District Court determined that the "highly deferential standard" imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) precluded habeas relief, it expressed serious concerns that the Minnesota Supreme Court's decision "[came] perilously close to satisfying AEDPA's strict standards" and "demonstrate[d] precisely the risk of a slow but steady erosion of constitutional rights." *Smith* v. *Smith*, 2018 WL 3696601, *10, *12 (D Minn., Aug. 3, 2018).

a brief nonpublic proceeding." *Id.*, at 692–693.

## II

### A

The Sixth Amendment guarantees that criminal defendants "shall enjoy the right to a . . . public trial." U. S. Const., Amdt. 6. To the Framers, secret trials "obviously symbolized a menace to liberty," and the public-trial right provided a necessary "safeguard against any attempt to employ our courts as instruments of persecution." *In re Oliver*, 333 U. S. 257, 269–270 (1948). Of course, the vast majority of judges and jurors would strive to uphold constitutional principles even if criminal proceedings were closed to the public. But "the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." *Estes* v. *Texas*, 381 U. S. 532, 588 (1965) (Harlan, J., concurring). Indeed, that is why public-trial violations are among the narrow class of "structural defects" that "defy analysis by 'harmless-error' standards." *Arizona* v. *Fulminante*, 499 U. S. 279, 309 (1991).

Despite the importance of the public-trial right, this Court recognized in *Waller* v. *Georgia*, 467 U. S. 39 (1984), that "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Id.,* at 45. But *Waller* cautioned that "[s]uch circumstances will be rare, . . . and the balance of interests must be struck with special care." *Ibid.* To that end, *Waller* announced four requirements that must be satisfied before a trial court may close a courtroom: (1) the closure must "advance an overriding interest that is likely to be prejudiced," (2) the closure must "be no broader than necessary to protect that interest," (3) the court must "consider reasonable alternatives to

closing the proceeding," and (4) the court must "make find-
ings adequate to support the closure." *Id.,* at 48.

Any doubt about the reach of *Waller*'s rule was dispelled
by *Presley*. There, this Court reiterated *Waller*'s holding
"that the Sixth Amendment right to a public trial extends
beyond the actual proof at trial." 558 U. S., at 212. As such,
*Waller*'s four-factor test "provide[s] standards for courts to
apply before excluding the public from *any stage* of a crimi-
nal trial." 558 U. S., at 213 (emphasis added).

### B

*Waller* and *Presley* straightforwardly govern the court-
room closure at issue in this case. During Smith's trial, the
court removed all members of the public and media from
the courtroom. The court then proceeded to issue an evi-
dentiary ruling that precluded several defense witnesses
from testifying.[4] Because the evidentiary ruling issued at
what was undoubtedly a "stage of [Smith's] criminal trial,"
*Presley*, 558 U. S., at 213, and because the court failed to
consider, much less satisfy, any of the requirements set
forth by *Waller*, the courtroom closure clearly violated
Smith's Sixth Amendment right to a public trial.

The Minnesota Supreme Court, however, thought differ-
ently. In its view, any proceeding that might be deemed

---

[4] No court—not the Minnesota Supreme Court, not the U. S. District
Court, and not the Eighth Circuit—has suggested that the trial court's
conjecture that the jurors might fail to "adhere to their oath," ECF Doc.
12–4, p. 6, Tr. 751, was sufficient to satisfy *Waller*'s four-factor test. It
plainly was not. See 2018 WL 3696601, *11 ("Th[is] Court has little dif-
ficulty concluding that the trial court's sua sponte closure during Smith's
trial fails the *Waller* test"); *State* v. *Smith*, 876 N. W. 2d 310, 341 (Minn.
2016) (Stras, J., concurring) ("If we were to apply the *Waller* factors to
the courtroom closure in this case, there is little doubt that the closure
would fail them"). Indeed, the State made no objection to the Federal
Magistrate Judge's conclusion that "the trial court's closure would be un-
constitutional under *Waller*." 2018 WL 3696601, *10.

"administrative in nature"—including "scheduling," "routine evidentiary rulings," and "matters traditionally addressed during private bench conferences or conferences in chambers"—fall outside the Sixth Amendment's protection entirely. *Smith*, 876 N. W. 2d, at 329–330. This novel exception sharply departs from this Court's precedents.

The Minnesota Supreme Court reasoned that courtroom closures during "administrative exchanges" "'do not hinder the objectives which the Court in *Waller* observed were fostered by public trials'" because such exchanges "'ordinarily relate to the application of legal principles to admitted or assumed facts so that no fact finding function is implicated.'" *Id.,* at 329 (quoting *United States* v. *Norris*, 780 F. 2d 1207, 1210 (CA5 1986)). But even if *Waller* could be read to apply only to factfinding proceedings (a dubious assertion), *Presley* plainly cannot. *Presley* held that "the Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors." 558 U. S., at 213. Jury selection hardly implicates a court's "fact finding function." That does not matter, of course, because "the Sixth Amendment right to a public trial extends beyond the actual proof at trial" to "any stage of a criminal trial." *Id.,* at 212–213. Indeed, it is telling that, to support its distinction between factfinding and law-application proceedings, the Minnesota Supreme Court primarily relied upon a case that predates *Presley* by almost 25 years. See *Smith*, 876 N. W. 2d, at 329 (citing *Norris*, 780 F. 2d, at 1210).

The Minnesota Supreme Court also relied on the fact that the closed-courtroom ruling at issue here was "an outgrowth of two previous public hearings" in which "the court explain[ed] the parameters of its . . . written decision." *Smith*, 876 N. W. 2d, at 330. The court thus implied that an unconstitutional courtroom closure can be cured by contemporaneous publication of the substance of the closed

proceedings.[5]  That premise is false, as *Waller* made abun-
dantly clear: Even though "the transcript of the [closed]
suppression hearing was released to the public" in *Waller*,
this Court nevertheless found that the defendant's Sixth
Amendment right to a public trial had been violated.  467
U. S., at 43, 48.

That conclusion makes perfect sense in light of the ori-
gins and purposes of the Sixth Amendment public-trial
right.  "'The requirement of a public trial is for the benefit
of the accused; that the public may see he is fairly dealt with
and not unjustly condemned, and that the presence of in-
terested spectators may keep his triers keenly alive to a
sense of their responsibility and to the importance of their
functions.'"  *In re Oliver*, 333 U. S., at 270, n. 25 (quoting 1
T. Cooley, Constitutional Limitations 647 (8th ed. 1927)).  A
written order is no substitute for a live proceeding, espe-
cially when the order has been curated by the same court
that concealed its ruling from public view.  "People in an
open society do not demand infallibility from their institu-
tions, but it is difficult for them to accept what they are pro-
hibited from observing."  *Richmond Newspapers, Inc.* v. *Vir-
ginia*, 448 U. S. 555, 572 (1980) (plurality opinion).

Finally, the Minnesota Supreme Court drew an analogy
between the closed proceeding in Smith's case and sidebar-
like proceedings such as "private bench conferences or con-
ferences in chambers."  *Smith*, 876 N. W. 2d, at 329.  That
analogy is inapt.  Sidebars smooth the flow of trial by allow-
ing the court to have succinct, private discussions with
counsel without having to remove the jury each time such a

—————

[5] The trial court's order was not, in any event, a contemporaneous and
complete record of the closed proceedings.  As explained by the trial
court, the very purpose of the courtroom closure was to shield certain
information about Kriesel's and Kasper's proposed testimony from public
disclosure.  See ECF Doc. 12–4, at 6, Tr. 751.

conversation is necessary.[6]  When sidebar discussions become too lengthy or too contentious, judges commonly excuse the jury and discuss the matter in open court.  Sidebars are thus tools of expediency for the benefit of all parties to which, generally speaking, no party objects.  In Smith's case, by contrast, the court closed the courtroom before the jury was even seated (and over Smith's objection), not to facilitate trial efficiency but for the stated purpose of concealing information from the public.  Thus shielded from public view, the court proceeded to exclude the testimony of witnesses Smith thought critical to his self-defense theory.  Therefore, even accepting the Minnesota Supreme Court's view that some classes of sidebar-like exchanges do not constitute part of "any stage of a criminal trial," *Presley*, 558 U. S., at 213, the trial court's ruling here was no sidebar.[7]  The courtroom closure was therefore improper.

### C

Where, as here, a habeas applicant's claim of legal error "was adjudicated on the merits in State court proceedings," AEDPA permits a federal court to grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U. S. C. §2254(d)(1).  A state court's decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [this

––––––––––

[6]Notably, although sidebars happen out of the jury's earshot, they occur within full view of the public and the jurors.  See, *e.g.*, *State* v. *Morales*, 2019 ND 206, ¶17, 932 N. W. 2d 106, 114 ("Where a bench conference is held in view of both the public and the jury, despite their inability to hear what is said, the public trial right is satisfied by prompt availability of a record of those proceedings").

[7]The analogy to an in-chambers conference is even more strained.  Even assuming that certain matters related to a criminal trial may be resolved in the privacy of the judge's chambers, an evidentiary ruling on a motion *in limine* is wholly inappropriate to that setting.

Court's] cases." *Williams* v. *Taylor*, 529 U. S. 362, 405 (2000).

As explained above, the Minnesota Supreme Court's decision directly contradicted *Waller* and *Presley*. The court concluded that the trial court was not required to justify the courtroom closure because the public-trial right does not extend to proceedings that are "administrative in nature." *Smith*, 876 N. W. 2d, at 330. This Court, however, has held that "the Sixth Amendment's right to a public trial extends beyond the actual proof at trial," *Presley*, 558 U. S., at 212, and that "*Waller* provide[s] standards for courts to apply before excluding the public from *any stage* of a criminal trial," *id.,* at 213 (emphasis added). This Court has never suggested that the Sixth Amendment might countenance an exception for so-called administrative proceedings, much less that such an exception would extend to an important evidentiary ruling excluding testimony from multiple defense witnesses. The Minnesota Supreme Court's refusal to apply the *Waller* factors thus contravenes this Court's clear precedent.

The Eighth Circuit avoided this conclusion by artificially cabining *Waller* and *Presley* to their facts. In *Waller*, this Court found that the defendant's public-trial right was violated when the courtroom was closed during a suppression hearing; in *Presley*, the Court held the same when the courtroom was closed during jury *voir dire*. See *Waller*, 467 U. S., at 47; *Presley*, 558 U. S., at 213. In the Eighth Circuit's assessment, the only "'clearly established Federal law' under AEDPA" is that courtrooms may not be unjustifiably closed during "suppression hearings and jury selection proceedings, respectively." 958 F. 3d, at 692. Everything else in *Waller* and *Presley* is, according to the Eighth Circuit, mere "dicta." 958 F. 3d, at 692 (emphasis deleted).

The Eighth Circuit's cramped view of precedent is untenable. "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary

to that result by which [courts] are bound." *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 67 (1996). Lower courts must abide not only by the outcomes of *Waller* and *Presley* (*i.e.,* that the public-trial right extends to suppression hearings and *voir dire* proceedings) but also by the "rationale upon which the Court based [those] results," 517 U. S., at 66–67, (*i.e.,* that the public-trial right extends to any stage of a criminal trial). When this Court announces a legal principle and applies it to a particular factual situation, it is the legal principle itself, not the factual outcome, that becomes clearly established federal law.

The Eighth Circuit's interpretation of "dicta," moreover, contravenes both the terms of AEDPA itself and simple logic. Take this Court's explanation that, under AEDPA, a state-court decision is "contrary to . . . clearly established federal law" in either of two circumstances: "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law *or* if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 529 U. S., at 413 (emphasis added). The Eighth Circuit's understanding of what constitutes dicta would collapse this disjunctive list into the same test. If the only "holdings" of this Court are fact-bound outcomes, then "a conclusion . . . reached by this Court on a question of law" and a decision of this Court "on a set of materially indistinguishable facts" would be one and the same.[8] Imagine, too, how a state-court defendant

————————

[8] With respect to AEDPA's unreasonable-application prong, the Court has likewise cautioned lower federal courts against limiting the scope of "clearly established Federal law" to factually identical circumstances. See *Panetti* v. *Quarterman*, 551 U. S. 930, 953 (2007) (AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced'"); *White* v. *Woodall*, 572 U. S. 415, 427 (2014) (AEDPA does not "requir[e] an '"identical factual pattern before a legal rule must be applied,"'" and "state courts must reasonably apply the rules 'squarely established' by this Court's holdings to the facts

would fare under the Eighth Circuit's test if the courtroom were closed during nearly all phases of his trial—from opening arguments, to witness testimony and cross-examination, to closing arguments, to jury instructions and the reading of the verdict. By the Eighth Circuit's logic, so long as the courtroom remained open during jury selection (as required by *Presley*) and any suppression hearings (as required by *Waller*), the state court would not have run afoul of any clearly established federal law. The absurdity of this result speaks for itself.

In the end, the Eighth Circuit erred in asserting that "[n]either [*Waller* nor *Presley*] addressed whether a defendant enjoys a Sixth Amendment right to public 'administrative' proceedings of the type involved in this case." 958 F. 3d, at 692. Those cases unequivocally hold that courtrooms may not be closed (absent sufficient justification) during any phase of a criminal proceeding. It does not matter whether those proceedings are purportedly "administrative" or substantive, or whether they are focused on resolving questions of law or fact. Because the Minnesota Supreme Court's decision was contrary to *Waller* and *Presley*, the Eighth Circuit erred by affirming the denial of Smith's application for habeas relief.

\*    \*    \*

Today's decision denying Smith's request for plenary review is the last in a long series of misguided rulings. First, the Minnesota trial court violated the Sixth Amendment by closing the courtroom without adequate justification. Next, the Minnesota Supreme Court wrongly exempted the closed proceeding from the Sixth Amendment entirely, relying on a brand new administrative-proceeding exception that finds no basis in the Constitution or this Court's precedent. Then, by creatively redefining the meaning of "dicta," the

_____

of each case").

Eighth Circuit erroneously concluded that the Minnesota Supreme Court's decision was not contrary to clearly established Supreme Court precedent. And today, this Court misses the opportunity to correct these compounding injustices.

In reviewing Smith's habeas petition, the U. S. District Court for the District of Minnesota observed that "[t]he closure during Smith's trial is part of a broader and disturbing trend" in Minnesota, whose "courts are restricting public access to criminal trials more frequently and with greater severity." *Smith* v. *Smith*, 2018 WL 3696601, \*11 (Aug. 3, 2018). Justices of the Minnesota Supreme Court, too, have expressed alarm about "'creeping courtroom closure'" in Minnesota trial courts. *State* v. *Silvernail*, 831 N. W. 2d 594, 609 (2013) (Anderson, J., dissenting); see also *State* v. *Brown*, 815 N. W. 2d 609, 624, 626 (2012) (Meyer, J., dissenting) (discussing the Minnesota Supreme Court's exception for "trivial" closures). I share these jurists' well-founded concerns, and I regret this Court's refusal to provide much needed guidance to the lower courts. I would grant Smith's petition for a writ of certiorari and summarily reverse the judgment of the Eighth Circuit.